IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| Sarah Kavianpour, M.D.,<br><br>Plaintiff,<br><br>v. | ) | Civ. Act. No. |
| The Board of Regents of the University System of Georgia of which Augusta University is a member institution, served and sued through its Chair Harold Reynolds, | ) | Plaintiff's Certificate of Interested Persons and Corporate Disclosure Statement |
| Augusta University Medical Center, Inc. f/k/a MCG Health, Inc., ("AUMC") a component of Augusta University as a not-for-profit to further the health science education mission of the Medical College of Georgia, Augusta University | ) | |
| Phillip Coule, M.D., Chief Medical Officer ("CMO") for AUMC and BOR, and is sued in his individual and official capacities as a dual agent for AUMC and his employer BOR, and as a policymaker for action taken under color of law, | ) | |
| Clark Speese, who was or is AUMC's general counsel, and is sued in his individual and official capacity for AUMC, for actions taken under color of law and as a policymaker, | ) | |

Susan Norton, is Enterprise VP for Human Resources ("HR") and Chief HR Officer of AU and AUMC, and is sued in her individual capacity for actions taken under color of law and as a policymaker,

Debra Arnold ("Arnold") is AU's Director of Employee Relations for HR, and is sued in her individual capacity for action taken under color of law and as a policymaker,

Greg Bryan is counsel for AU, and is sued in his individual capacity, for actions taken under color of law, and as a policymaker,

Dr. Natasha Savage, is the Senior Associate Dean of GME and Designated Institution Official (DIO) for the ACGME Sponsoring Institution of AU and AUMC, and the Neurosurgery Residency Program, and is sued in her official capacity and as a policymaker for injunctive relief only,

Dr. Samuel Macomson, is Program Director for the Neurosurgery Residency Program, and is sued in his official capacity and as a policymaker for injunctive relief only,

Dr. David Hess, the Dean of the Medical College of Georgia, is sued in his official capacity for injunctive relief only,

for action taken under color of law. )
)
Brooks Keel, the President of AU and )
CEO of AU Health System, )
which is the parent institution of AUMC, )
and is sued in his official capacity as a )
policymaker for injunctive relief only, )
for actions taken under color of law. )
)
All defendants individually and jointly, )
)
Defendants. )
_______________________________________)

## COMPLAINT

COMES NOW Plaintiff, Sarah Kavianpour, by and through undersigned counsel, who hereby files her Complaint showing the Court as follows:

## INTRODUCTION

1. Plaintiff, Dr. Sarah M. Kavianpour, was a student and employee of Defendants as a resident physician in the Neurosurgery program at Augusta University and AU Medical Center, until Defendants suspended her hospital access and terminated her on February 21, 2019, falsely asserting that they could not review or overturn the suspension and therefore termination was required. Defendants then provided her a sham appeal and grievance hearing process that did not allow her to contest the suspension. After officials from the University

System of Georgia informed Defendants that they had not provided the necessary process to Dr. Kavianpour, Defendants alleged that they reinstated Dr. Kavianpour in order to provide that process, but they continued to provide a sham process and she was terminated on August 23, 2020. After Plaintiff notified the Accreditation Council for Graduate Medical Education ("ACGME") of Defendants' denial of adequate processes, in December 2021 the ACGME issued Defendants a citation for substantial non-compliance with respect to the lack of necessary process for Dr. Kavianpour, but Defendants have continued to refuse to reinstate her.

2. Plaintiff brings claims of retaliation including the termination in August 2020, under the ADA and Rehabilitation Act (Count I), deprivation of procedural due process with respect to the suspension by Dr. Coule (Count II), procedural due process with respect to the non-renewal finalized on August 2020 and including lack of remedial period before the non-renewal, (Count III), procedural due process for the initial termination that was not finalized until August 2020 (Count IV), and Defendant's stigmatizing and publicized statements about Dr. Kavianpour (Count V), breach of contract (Count VI), and mandamus (Count VII).

3. Plaintiff's claims post-date or accrued after the filing of Plaintiff's prior lawsuit against these Defendants that is currently pending in the Northern District of Georgia, case no. 1:20-cv-00152.

## PARTIES

4. Plaintiff, Sarah M. Kavianpour ("Plaintiff" or "Dr. Kavianpour") is a United States citizen and resident of South Carolina who was a resident physician within the Neurosurgery program operated by Defendant Board of Regents of the University System of Georgia ("BOR"), doing business as Augusta University ("AU"), and the Augusta University Medical Center, Inc. ("AUMC").

5. Defendant Board of Regents, pursuant to O.C.G.A § 20-3-51, is vested with the governance, control, and management of the University System of Georgia ("USG") of which AU is a member institution. BOR is headquartered in Fulton County, Georgia, and may be served through its Chair Harold Reynolds.

6. Defendant Augusta University Medical Center, Inc. ("AUMC") f/k/a MCG Health, Inc., which is referred to as a component unit of AU in their financial documents, is designated as a not-for-profit with the purpose "to further the health science education missions and other tax-exempt functions and purposes of the Medical College of Georgia," according to its articles of incorporation, and

pursuant to a Master Affiliation Agreement in which AUMC "shall be responsible for monitoring and facilitation of MCG Hospital and Clinics institutional compliance with ACGME and LCMS standards and requirements with respect to [AU] training programs, including (a) any ACGME requirements for participating institutions, and (b) applicable requirements for undergraduate and graduate clinical teaching facilities. [AUMC] shall cooperate with [AU]'s activities in maintaining and accreditation... and shall notify [AU] of any matters to its knowledge that may compromise such accreditation." (Master Affiliation Agreement FY 14, p. 16-17).

7. Defendant BOR doing business as AU, and AUMC are employers subject to suit under the ADA, as they have 15 or more employees and are engaged in interstate commerce.

8. Defendant BOR doing business as AU, and AUMC, are subject to suit under the Rehabilitation Act because AU and AUMC receive federal funding including through grants from CMS for medical education and payment for resident medical treatment of Medicare patients via Direct Graduate Medical Education ("DGME") and Indirect Medical Education ("IME") payments; whereby AUMC's participation in the residency program allows AUMC to bill CMS a premium for procedures performed by the resident physicians, used to teach

residents to be well-trained, certified specialists, in the public interest of improved health care, fulfilling the goals of the CMS grants for specialty training.

9. Defendant Phillip Coule is the hospital's Chief Medical Officer ("CMO") for AUMC and BOR, who suspended Dr. Kavianpour's hospital access, and is sued in his individual and official capacities as a dual agent for Defendant AUMC and his employer BOR, for action taken under color of law.

10. Defendant Clark Speese was or is AUMC's general counsel, and is sued in his individual and official capacity for AUMC, for actions taken under color of law.

11. Defendant Susan Norton ("Norton") is Enterprise VP for Human Resources ("HR") and Chief HR Officer of AU and AUMC, and is sued in her individual capacity for actions taken under color of law.

12. Defendant Debra Arnold ("Arnold") is AU's Director of Employee Relations for HR, and is sued in her individual capacity for action taken under color of law.

13. Defendant Greg Bryan is counsel for AU, and is sued in his individual capacity, for actions taken under color of law.

14. Defendant Dr. Natasha Savage, is the Senior Associate Dean of GME and Designated Institution Official (DIO) for the ACGME Sponsoring Institution and the Neurosurgery Residency Program, is sued in her official capacity for injunctive relief only, for actions taken under color of law.

15. Defendant Dr. Samuel Macomson is Program Director for the Neurosurgery Residency Program, and is sued in his official capacity for injunctive relief only, for actions taken under color of law.

16. Defendant Dr. David Hess, the Dean of the Medical College of Georgia, is sued in his official capacity for injunctive relief only, for action taken under color of law.

17. Defendant Brooks Keel is President of AU and CEO of AU Health System which is the parent institution of AUMC, and is sued in his official capacity for injunctive relief only, for actions taken under color of law.

**JURISDICTION AND VENUE**

18. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over Counts I-V of this Complaint, which arise out of the Americans with Disabilities Act, 42 U.S.C. § 12111, et seq., Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, 42 U.S.C. § 1983, *ex parte Young*, and the 14th Amendment of the United States Constitution.

19. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Counts VI & VII, which arise under Georgia law.

20. The venue is proper in this Court because a substantial portion of the education and employment practices described herein occurred within the Atlanta Division of the Northern District of Georgia, and because at least one Defendant resides in this division and upon information and belief all Defendants reside within the state, and, alternatively, the venue is proper in this court because at least one defendant is subject to this court's personal jurisdiction with respect to this action.

## STATEMENT OF FACTS

21. BOR and AUMC fraudulently precluded a grievance or appeal for the AUMC suspension through concealment or omission when they did not provide Dr. Kavianpour with the process she was entitled to, even when she asked for it, and by making affirmative misrepresentations that there was no process owed, and they were deliberately indifferent to their contractual obligations to provide a GME appeal i.e., grievance under HS 13.0 that could have reinstated clinical duties.

22. Defendants owed Dr. Kavianpour a student appeal process, which is the GME appeal process that can overturn Dr. Coule's suspension, but Defendants only provided Dr. Kavianpour the employee appeal process for the termination which

was a sham, meaningless, and futile because it goes through AU HR that does not have any authority to overturn the denial of hospital privileges, which was the basis for the termination, and because it avoided addressing the cause of the termination, which was the suspension of privileges.

23. Dr. Kavianpour was entitled to the GME appeal process under HS 13.0 for the suspension by Dr. Coule, which still has not been provided.

24. Dr. Kavianpour's remedial period was part of the process she was due under the contractual HS 18.0 before a decision of non-renewal could be taken by the Sponsoring Institution and the Neurosurgery Residency Program at AUMC.

**Dr. Kavianpour's Contractual Rights and Property Interest**

25. Dr. Kavianpour's 2018-2019 employment contract incorporated the "Terms and Conditions of Housestaff Service to AU Health" which provides that as a resident Dr. Kavianpour could only be removed from clinical activities "for cause" – this was first obtained in discovery in October 2021. [Doc. 178-13 § 6b at ECF p. 2 (under "Contract and Job Description," it states "AU will develop a formal employment contract and job description for all Housestaff. The job description will address … the process for removal of residents from clinical duties for cause."); Doc. 178-1 Macomson 30(b)(6) Dep. at 26:1-21]

26. AUMC is mentioned in multiple sections of Dr. Kavianpour's employment contract, i.e the Notice of Appointment, [Doc. 208-6] and is a party through the signed affiliation agreements between BOR and AUMC.

27. AU Medical Center, Inc. ("AUMC") and its parent, AU Health System, Inc. maintain a "Research, Education, and Professional Services Agreement" ("REPSA") with the BOR Defendant. [Doc. 204-8 (pertinent parts of the agreement)]

28. One of the Exhibits to the REPSA is the "Terms and Conditions of Housestaff Service to AU Health," as to which the Housestaff (Plaintiff), BOR, and AUMC are parties.

29. On August 4, 2021, Graduate Medical Education (GME) Manager Candice Henderson explained to the new Designated Institutional Official and Dean of GME, Dr. Natasha Savage that "The Residents' [Dr. Kavianpour's] dismissal [on February 21, 2019] was different from most and because the hospital terminated her for patient safety concerns then she was notified of termination" [Doc. 221-14 ECF p. 1] because Dr. Savage was being asked to provide "Clarifying Information" to ACGME because there was "validity" to Dr. Kavianpour's complaint that she submitted in July 2020 about both terminations discussed

below to ACGME that Defendants did not follow House Staff policies related to performance and due process in its treatment of Dr. Kavianpour.

30. In her deposition in June 2022, Dr. Savage clarified the hierarchy of authority for policies stating the order was: state and federal laws, ACGME requirements, GME HS policies (which "supersedes all other [internal] policies regarding House Staff"), intradepartmental policies, AU policies, and then AU Health.

31. Dr. Savage also explained that the GME house staff policies serve to fulfill ACGME requirements.

32. Contrary to the misrepresentations by in-house counsel Greg Bryan in July 2020, [Doc. 201-36 ECF p. 6] Dr. Coule's decision to suspend was reviewable or appealable and BOR had the authority to overturn Dr. Coule's decision but refused to exercise that authority because AUMC was used to evade Dr. Kavianpour's contractual due process rights.

33. BOR intentionally ignored its obligations to Dr. Kavianpour to provide her with the contractually required GME appeal processes before and after her terminations and for the suspension of her clinical activities by AUMC.

34. Dr. Kavianpour's contract required progressive discipline under the incorporated House Staff Policies 18.0 and 13.0 and the "Terms and Conditions of Housestaff Service to AU Health" indicated that she can only be removed from clinical

activities "for cause," instead BOR and AUMC worked together to use Dr. Coule's title as CMO to subject her to retaliatory adverse actions, the simultaneous suspension-termination, and to regard her like an at-will employee of AUMC's Dr. Coule without an appeal right for the suspension. [Doc. 192-4 (termination letter)]

35. The "Terms and Conditions of Housestaff Service to AU Health" permitted Dr. Coule to issue a temporary denial of access for "safety" reasons, but it indicates that "Within 24 hours of this action in denying access, AU Health will notify AU of this action and the reasons therefore AU Health will provide all information reasonably requested by MCG relating to the denial of access and shall cooperate in AU's investigation of the denial. AU shall have the sole right to determine whether to take any disciplinary action against the student, resident." [Doc. 178-13 ¶ 9 ECF p. 4]

36. Although he acknowledged that residents are entitled to "due process" in the form of an investigation into the reasons for suspension of privileges, Dr. Coule did not know of the University doing any investigation into his suspension of Dr. Kavianpour's clinical activities. [*Id.* 23:2-5, 91:12-93:22; 100:15-101:1 ("everybody is fully aware that there is a due process for any of the actions that

are taken."); 101:2-15 ("that is the due process that she is entitled to -- is the investigation conducted by the school."); 105:8-20.].

37. On March 14, 2019, AU's in-house counsel Chris Melcher emailed AU and AUMC officials explaining that "AUMC and [BOR's] GME have exclusive authority over credentials and privileges for residents." [Doc. 192-23]

38. On July 29, 2019, Dr. Coule had emailed USG's Wesley Horne the provision of the Medical Staff Bylaws that he relied on to exercise his authority. [Ex. 266 BOR0043638 7.29.19].

39. On November 26, 2019, Dr. Coule admitted to USG's Wesley Horne that his decision was appealable through GME and Dr. Coule was instructed to better elucidate the process going forward. [Doc. 165-2 Pl. Ex. 164; Doc. 203 Horne Dep. at 289:23.] Wesley Horne's notes were obtained in discovery around October 2021.

40. On December 11, 2019, USG officials essentially told AU and AUMC officials that Dr. Coule's CMO suspension of Dr. Kavianpour was reviewable or appealable by BOR through the GME appeal process and that should have occurred before she was terminated from the residency program. [Doc. 178-16 at ECF pp. 1-2 ("Ultimate Authority is the State… Interpretation by USG is that the letter from Dr. Coule notifying her of "suspension" is that she should have been

given rights under [HS policy] 13.0…"); Doc. 194 Norton Dep. 226:23-229:20; Pl. Ex. 413, BOR0065927, p. 4 (Arnold's notes of the meeting).]

**Under Color of Law And State Action**

41. Dr. Coule suspended Dr. Kavianpour's hospital access on February 21, 2019, in his capacity as Chief Medical Officer (CMO) for AUMC.

42. Dr. Coule is a BOR employee.

43. BOR approved Dr. Coule as taking on the dual role of CMO and Associate Dean for Clinical Affairs for AU Health System (AUMC's parent institution) & Augusta University.

44. Dr. Coule serves as CMO at the pleasure of BOR.

45. Dr. Coule's official job description states that he should work "in conjunction with the Enterprise Vice President of Human Resources" and the Clinical Chairs to identify and manage allegedly impaired physicians.

46. The Enterprise (BOR and AUMC) Vice President of Human Resources was Susan Norton during the relevant time.

47. AUMC's Clark Speese, Dr. Coule, Susan Norton, BOR's Debra Arnold, and Greg Bryan agreed on a "plan" to suspend Dr. Kavianpour if BOR's Drs. Macomson and Vale were inclined to retain her by (mis)informing them that a

suspension of clinical access requires termination from the federal-funded residency program and that they could not overturn Dr. Coule.

48. Dr. Coule and Clark Speese were part of the plan to have the suspension occur in "conjunction" with the termination, and Clark Speese asked for and received input and approval on Dr. Coule's draft suspension notice from BOR's Greg Bryan and Chris Melcher.

49. BOR and AUMC, including Dr. Coule, planned and coordinated together to deny Dr. Kavianpour adequate process before and after the February 21, 2019, suspension-termination.

50. Drs. Macomson and Vale were admittingly "not really" the decision-makers on the termination, and said instead it was Dr. Coule and Enterprise HR's Norton.

51. Until Dr. Macomson's deposition in March 2022 he believed that he and Dr. Vale had no authority to overturn Dr. Coule, so BOR was intentionally participating in the conspiracy to create the impression that control over access to clinical faculty and the facility could be determined at the pleasure of the AUMC CMO, when in reality, and consistent with the grant, the medical faculty who supervise the residents under the grant have final authority.

52. Dr. Kavianpour's Program Director, Dr. Macomson, became aware of "Terms and Conditions of Housestaff Service to AU Health" for the first time during a 30(b)(6) deposition in March 2022.

53. At all relevant times, Dr. Macomson admitted that he was unaware that he had the authority to overturn Dr. Coule's suspension of clinical activities as Program Director. [Doc 178-1 Macomson 30(b)(6) 30:2-31:10; Doc. 178-12 March 2019 Grievance Hearing transcript, 385:10–386:1 ("I can't overrule Dr. Coule"); Doc. 192 Macomson Dep. 179:12-180:17 (for the January 2020 CCC process Dr. Macomson said he did not know if he could overturn Dr. Coule's decision to suspend Dr. Kavianpour's privileges and that he has "no jurisdiction over [House Staff] privileges")].

54. The President of Augusta University and CEO of AU Health System, Dr. Brooks Keel, admitted that Graduate Medical Education at MCG is a "joint effort between the hospital and the medical college." [Doc. 204 Keel Dep. 6:24-25; 24:10- 25:10.]

55. BOR provides Housestaff to AUMC and AUMC reimburses BOR costs for Housestaff services (salaries and benefits and other costs); AUMC provides the clinical facilities, equipment, and personnel (the teaching hospital, Medical Staff supervisors, and other health professionals); and Defendants BOR and AUMC

work together to sustain state and federal funding. [Doc. 208-4 Pl. Ex. 157 REPSA Bates No. AUMC 43-45, 47-49; Doc. 178-13 Pl. Ex. 156 T&C.]

56. The U.S. Department of Health and Human Services Centers for Medicare & Medicaid Services ("CMS") reimburses AU Medical Center Inc. for resident physician (a.k.a. "Housestaff") salaries, benefits, and services through Direct Graduate Medical Education (DGME) payments (43 CFR §§413.75 through 413.83) and Indirect Medical Education (IME) payments (42 CFR §412.105) for approved graduate medical education (GME) programs, which requires Accreditation Council of Graduate Medical Education ("ACGME") accreditation under 42 C.F.R. §§ 413.75(b), 415.152.

**Dr. Kavianpour's Protected Activity Less Than A Month Before The Coordination Of The Suspension And Termination**

57. According to Debra Arnold's January 22, 2019 email, Dr. Kavianpour had "been compliant" until the January 17, 2019 drug test request, [Doc 194-20 Pl. Ex. 169; Doc. 194 Norton Dep. at 269:11- 270:18] which was when she was off-duty.

58. Dr. Macomson testified, as BOR's 30(b)(6) witness, that "there would be no expectation of her to test on a day off," [Doc. 178-1 Macomson 30(b)(6) Dep. 84:1-85:5] but Susan Norton emailed Debra Arnold: "Please pull the policy and see if it speaks to an employee not adhering to the test requirements. In the Med

Center, I believe it would be considered a presumptive positive. I took everyone off so we can gather this information first and then determine next steps." [Doc. 194-19 at 1].

59. In between the off-duty drug test request of January 17, 2019 and the February 13, 2019 test request, HR's Norton and Arnold did not meet with Dr. Kavianpour as requested on January 22, 2019 to clarify policies, [Doc. 186-11; Doc. 186 Arnold Dep. 66:10-68:7; Doc. 189 Kavianpour Vol I Dep. 227:16-24] or for a more reasonable arrangement for the testing and instead wrote a memo with AUMC and AU in-house counsel Clark Speese and Greg Bryan that was issued to her on January 31, 2019 to describe Dr. Kavianpour's clinical duties as an excuse. [Doc. 186 Arnold Dep. 183:15-184:20 ("she couldn't use patient care as an excuse")]

60. BOR and AUMC Vice President of Human Resources Susan Norton knew that Dr. Kavianpour was challenging the legality of what Norton was doing [Doc. 194 Norton Dep. 179:9-15] in her January 31, 2019 email about their implementation of drug testing. [Doc. 186-11]

61. Dr. Kavianpour never refused to be drug tested and Susan Norton was informed of that on January 31, 2019. [Doc. 194 Norton Dep. at 155:20-23]

62. When questioned about Dr. Kavianpour's January 2019 emails and why HR did not refer Plaintiff's complaints about HR to be investigated, Susan Norton's response was: "We continued to seek the advice of our Legal Affairs Office on this entire matter." [Doc. 194 Norton Dep. at 154:17-159:5]

63. For the next drug test request, on February 13, 2019, Debra Arnold did not follow her January 31, 2019 memo to go through the Program Director or designee to determine if Dr. Kavianpour's clinical activities would prevent her from presenting before contacting Dr. Kavianpour.

64. Arnold bypassed the step that the Defendants had created in the memo and that was standard practice at the Medical Center when Arnold contacted Dr. Kavianpour directly and gave her a 4 PM deadline; Dr. Kavianpour explained that every resident in the operating room was assigned to cases and she did not have backup coverage for the on-call neurosurgery pager.

65. Dr. Kavianpour asked to transition care to Dr. Sparks when he was between cases, but he refused.

66. Dr. Kavianpour had to put patients first over HR's drug test because Dr. Kavianpour's contract required her "to perform satisfactorily and to the best of his/her ability the customary services of residency; to conform to applicable policies, procedures and regulations," [Doc. 192-6 at ¶ 8.] and under HS Policy

24.0 Transition of Care (TOC), "6.7 A Resident physician must not leave the hospital until an effective TOC has occurred," [Doc. 228-24 at BOR 67453] so on February 13th Dr. Kavianpour "did not feel comfortable abandoning any patient care and responsibilities." [Doc. 178-12 at 77:4-21.]

67. HR's Norton and Arnold and Greg Bryan and Clark Speese sought to suspend or terminate Dr. Kavianpour for not presenting within four hours on the afternoon of February 13, 2019, for a drug test, which was not consistent with the policy that allowed up to 48 hours, [Doc. 194 Norton Dep. at 182:21-183:8, 210:18-211:20; Doc. 186 Arnold Dep. at 107:20-25] and when Dr. Kavianpour presented first thing in the morning on February 14, 2019 (within 24 hours), Debra Arnold had requested that Employee Health not test her. [Doc. 186 at 124:20-125:3; Doc. 186-21.]

68. The voluntary provision of the "For Cause" policy for situations where there may be "doubt," permitted a drug test on the morning of February 14, 2019, but HR's Norton and Arnold **refused** to drug test Dr. Kavianpour in violation of Augusta University's Substance Abuse Policy, [Doc. 194-8 Pl. Ex. 31 (policy) p. 4 ¶ 7] which would clear her name.

**The Coordination Before the Simultaneous AUMC Suspension and AU Termination**

69. Norton admits in her deposition that during the period of deciding whether to suspend or terminate, which was between February 14 and 21, 2019, she learned that Dr. Vale, the Neurosurgery Chair, had indicated that he would take the on-call neurosurgery pager for Dr. Kavianpour to present within HR's window for future monthly drug tests. [Doc. 194 at 290:1-4, 293:22-294:2, 294:23-295:13; Doc. 178-12 at 204:9-17; Doc. 197 at 80:1-5].

70. On February 18, 2019, handwritten notes from Debra Arnold (Augusta University's HR Department) in a meeting about Plaintiff reflect that they knew before the adverse actions were taken against Dr. Kavianpour that Dr. Kavianpour was entitled to two appeal processes, including the GME student appeal process that could overturn the suspension. [Doc. 208-10 ECF p. 10 ("grievance process student & employee."); Doc. 178-16; BOR0065927]

71. Sometime between February 18 and 21, 2019, other handwritten notes by Debra Arnold from Augusta University's HR Department indicate: "Clark [Speese of AUMC] – Philip [Coule] is on board w/ the plan. If suspension Dr. Coule will write letter re clinical duties being suspended" [Doc. 228-20, Pl. Ex. 265, BOR0035123].

72. BOR is required to, but did not provide, an investigation into an AUMC suspension of clinical activities decision for Dr. Kavianpour. [Doc. 177-2 Coule Dep. 23:2-5, 91:12-93:22; 100:15-101:15, 105:8-20].

73. Based on HR handwritten notes produced by BOR, HR officials Norton and/or Arnold knew that an investigation would be owed to Dr. Kavianpour if AUMC takes an action against Dr. Kavianpour's resident privileges. [Doc. 228-17 (handwritten notes about "school's investigation" into Medical Center ("M.C.") suspension requirement that does not occur)]

74. HR officials Norton and Arnold circumvent an investigation by design through simultaneous suspension and termination.

75. Dr. Macomson admits that in a meeting that included Dr. Coule, HR's Norton or Arnold made "two suggestions" for Dr. Kavianpour's "suspension and termination." [Doc. 192 Macomson at 47:12-18]

76. On February 19, 2019, Clark Speese, in-house Legal Counsel for AUMC, sought input from in-house Legal Counsel for Augusta University: Greg Bryan, and Chris Melcher for the AUMC letter to be used by Dr. Coule to suspend Dr. Kavianpour's clinical activities at the Medical Center, which Melcher approved on February 19, 2019. [Doc. 194-18 ECF pp. 16-17].

77. On February 20, 2019, BOR's Debra Arnold noted the next steps and plan for simultaneous AUMC suspension and BOR termination. [Doc. 208-10 ECF p. 11] which states in part: "Urine drug screens to Dr. Coule would like to review prior to issue the letter."

78. BOR's Debra Arnold's unauthorized disclosure of protected health information on February 20, 2019, led to Dr. Kavianpour's suspension and termination the next day on February 21, 2019 because AUMC's Dr. Coule, who testified that he previously did not know who the individual was, relied on the initial and "canceled" test result of June 25, 2018, where the original authorization to release or disclose the initial test finding expired on July 1, 2018, to make the baseless accusation that Plaintiff was an impaired physician with a substance use disorder [Doc. 177-2 Coule Dep. 36:25-37:7, 52:9-21] in March 2019 with seven negative tests in between.

79. Emails and notes demonstrate that the implicated HR officials Norton and Arnold wrote Dr. Kavianpour's February 21, 2019 termination letter, deciding to structure Dr. Kavianpour's appeal based on exigencies of the moment (no reversal of the AUMC suspension) removing the first level from Dr. Moore to Dr. Vale, where the termination letter already indicated that she could not be trained in the department because of the suspension of clinical activities, and only

indicating that Dr. Kavianpour "may file a grievance with the Human Resources," not the contractual grievance through GME. [Doc. 208-10 ECF p. 11 ("appeals to (Dr. Vale?) remove Dr. Moore"); Doc. 192-4 (term letter)]

80. GME DIO Dr. Moore was removed and the HS 13.0 grievance was not provided in her termination letter because those appeals could result in reinstatement of hospital privileges and emails demonstrate that HR precluded Dr. Moore's appearance at the HR hearing in March 2019 even though he was listed as a witness for Dr. Kavianpour.

81. On February 20, 2019, Clark Speese emailed Susan Norton and Greg Bryan, providing Dr. Coule's suspension letter from AU Medical Center "to be used in conjunction with the termination letter" from Augusta University for Dr. Kavianpour. [Doc. 194-18 ECF p. 23; Doc. 195 Norton Mar. Dep. 44:5-46:16]

82. Dr. Macomson admits that the February 21, 2019 termination letter was drafted for him by one person or a group collaboration that included HR's Susan Norton or Debra Arnold, who decided that the suspension by Dr. Coule meant that Dr. Kavianpour cannot be trained in the health system and must be immediately terminated from her residency. [Doc. 178-1 Macomson 30(b)(6) Dep at 117:3-118:2]

83. Dr. Coule testified that he did not independently investigate the allegations presented to him by Debra Arnold in her February 21, 2019 memorandum regarding Dr. Kavianpour. [Doc. 177-2 Coule Dep. at 52:9-21; Doc. 187-5 Pl. Ex. 5; Doc. 186-10 Pl. Ex. 11; Doc. 186 Arnold Dep. 160:17-162:12]
84. Dr. Coule did not "ever independently investigate" AU's drug testing policies and procedures to see if they were properly followed regarding Dr. Kavianpour and Dr. Coule could not name any AUMC policy or procedure for monitoring that he claimed Dr. Kavianpour was subjected to. [Doc. 177-2 Coule Dep. at 139:13–140:22].
85. Dr. Vale, the Neurosurgery Chair, indicated that Dr. Coule had taken disciplinary action against Dr. Kavianpour and they were just notified of the action. [Doc. 197 Vale Dep. at 147:3-148:2, 150:22-25].
86. Dr. Vale did not know the reason for Dr. Coule's suspension of Dr. Kavianpour. [Doc. 197 Vale Dep. 145:5-12].
87. Dr. Vale testified that he and Dr. Macomson were not decision-makers because Dr. Coule is above all of them at the hospital level. [Doc. 197 Vale Dep. 139:12-17]

**February 21, 2019 Simultaneous AUMC Suspension and AU Termination**

88. On February 21, 2019, Dr. Kavianpour received notice of "immediate suspension from all clinical activities" from Dr. Coule based on a purported patient safety concern that was given to her with a residency termination letter that occurred because of the suspension by Dr. Coule. [Doc. 187-3 Pl. Ex. 3 (suspension letter); Doc. 192-4 (termination letter about AUMC's suspension); Doc. 192 Macomson Dep. at 99:10-11(the Program Director and supervisor, Dr. Macomson, has testified that Dr. Kavianpour's suspension of privileges from AUMC was the "triggering event" for her termination.)]

89. On February 21, 2019, upon notice of the suspension and termination, Dr. Kavianpour asked if Dr. Coule's suspension "was forever" with no response. [Doc. 229-3 ¶ 60 ECF p. 15; Doc. 208-10 ECF p. 12 (Arnold's notes of meeting)]

90. The February 21, 2019, "Notice of Discharge" from Dr. Macomson to Dr. Kavianpour stated in a pertinent part:

> Your employment with [AU] is terminated effective immediately.
> The reason for this action is:
> The Chief Medical Officer for the Health System has exercised his discretion and authority to revoke your ability to practice in the medical center and related facilities. Therefore, you are not able to be trained in the health system, which is a requirement for you to be in our residency program.

[Doc. 40-3 at 2.]

91. Unlike all the other decision letters, the suspension letter by Dr. Coule does not indicate how his decision can be appealed. [Doc. 192-3.]

92. Decisions and outcomes were predetermined when the Neurosurgery decision-makers were not informed or unaware of their authority to overturn Dr. Coule's suspension of Plaintiff's clinical activities, [Doc. 178-12 at 207:4-17, 385:10–386:1; Doc. 192 Macomson Dep. 179:12-180:17; Doc. 197 Vale Dep. 157:1-21, 139:12-17] and an investigation into the reasons for the suspension were not provided [Doc. 192 Macomson Dep. at 50:3-21] as required under Section 5.1 of the Medical Staff Bylaws, [Doc. 190-13 Medical Staff Bylaws ECF p. 13], and the "Terms and Conditions of Housestaff Service to AU Health." [Doc. 178-13 ¶ 9 ECF p. 4]

93. Ordinarily, when a resident physician is terminated at MCG, she is placed on paid administrative leave pending her GME appeal like Dr. Lesley Williams was in March 2019. [*Lesley Williams v. BOR*, S.D. Ga. Case 1:20-cv-00100-JRH-BK, Doc. 150-1]

94. When Dr. Kavianpour was suspended and terminated on February 21, 2019, Dr. Kavianpour's pay and benefits ceased on about February 23, 2019.

95. The outcome of any "appeal" by Dr. Kavianpour was predetermined because on March 1, 2019 when BOR's agents (GME's Candice Henderson with

approval of AU's Debra Arnold and in-house counsel Greg Bryan) had already decided that Dr. Kavianpour was "ineligible for rehire" at AU and AUMC. [Doc. 221-24 ECF p. 1 ("this person is ineligible for rehire at this institution (AU, AU Medical, and GCHS).")]

96. The "appeal" processes in 2019 and 2020 were futile by design by ensuring that Dr. Coule's suspension decision was "not reviewable or appealable." [Doc. 201-36 ECF p. 6 (AU in-house counsel Greg Bryan's statement in July 2020)]

**Attempts to Appeal Adverse Actions of the February 21, 2019 Suspension and Termination**

97. On February 25, 2019, pursuant to the Notice of Discharge, [Doc. 192-4] Dr. Kavianpour appealed her the termination to Dr. Fernando Vale, who became the Head of the Neurosurgery Department on or about February 1, 2019.

98. When Dr. Vale met with Dr. Kavianpour on about February 28, 2019, Dr. Vale told her that he could not overturn the suspension of clinical activity by Dr. Coule. [Doc. 178-12 at 207:4-17.].

99. Dr. Vale testified that he did not think he could overturn Dr. Coule and indicated that he upheld the discharge based on Dr. Coule's suspension. [Doc. 197 Vale Dep. at 157:1-21].

100. HR's grievance policy for AU employees permitted Dr. Kavianpour to have one spokesperson/advocate at the HR hearing in March 2019, so Dr. Kavianpour asked Dr. Vale, who agreed, but Debra Arnold prohibited it.

101. On March 4, 2019, Dr. Kavianpour followed Vale's instructions and submitted a statement of grievance to Human Resources' Becky Williams and Debra Arnold and informed them that Dr. Vale was going to be her advisor.

102. On March 5, 2019, Dr. Coule and AUMC legal ignored Dr. Kavianpour's email inquiries [Doc. 228-10] and the indirect inquiry by Debra Arnold on March 4, 2019 [Doc. 187-12] about the process to appeal or reinstate a resident's privileges or clinical activities.

103. Dr. Kavianpour's March 4th and 5th email inquiries to both Coule and Arnold as to what process she needed to pursue to have privileges restored went unanswered.

104. On March 5, 2019, HR's Debra Arnold emailed GME's Candice Henderson and in-house counsel Greg Bryan indicating in pertinent parts:

> I spoke with Dr. Vale late afternoon yesterday and expressed to him that serving as Sarah's advisor for the grievance may send the wrong message… I believe she has received mixed messaging from Dr. Vale and Dr. Macomson to the tune of, this is an institutional decision and what she is hearing is that the two are supportive of her returning. I didn't receive the same message from Dr. Vale when we spoke yesterday. Perhaps we need to have a telephone conference

> about this grievance process (again) for Drs. Vale and Macomson to better understand.

[Doc. 228-12 Pl. Ex. 171 ECF p. 2]

105. Candice Henderson replied in part: "Yes I agree that a phone conference would help to guide the Program Director and Chair through this process." [Doc. 228-12 Pl. Ex. 171 ECF p. 1].

106. Susan Norton subsequently replied:

> It does seem like a phone call or meeting is in order and I too am concerned about mixed messages. There is also an email that Dr. Kavianpour has sent to Dr. Coule to request that he lift the suspension associated with her clinical privileges and she seems to suggest that Dr. Vale is supportive of her in that message as well. It is attached. Greg, Dr. Moore, I am especially interested in your take on this.

[Doc. 228-12 Pl. Ex. 171 ECF p. 1]

107. On March 12, 2019, Dr. Kavianpour requested that the grievance she filed with HR to be for the suspension and termination or for her to be provided a grievance for the suspension because that was the cause of the termination, indicating in a pertinent part of her email to HR's Norton, Arnold and Williams, Neurosurgery's Drs. Macomson and Vale, and Dr. Coule: "Also, the discharge/termination paperwork from Dr. Macomson indicates that reason for my termination is because of the suspension. I'm not trying to chase my tail. That

would effectively be a denial of due process. Just like my appeal to Dr. Vale. This an essential component that needs to be clarified. There cannot be any misdirection." [Doc. 192-23 Pl. Ex. 172 ECF p. 4; Doc. 194 at 133:1-136:21]

108. In a March 12, 2019 email in response to Dr. Kavianpour's grievance inquiries, seeking a grievance for suspension by Dr. Coule, HR's Debra Arnold wrote to HR's Becky Williams: "The clinical suspension is not something she can appeal through the AU policy," [Pl. Ex. 120] which Becky Williams relayed to Dr. Kavianpour.

109. On March 13, 2019, Dr. Kavianpour indicated in a pertinent part of her reply email to HR's Norton, Arnold, and Williams, Neurosurgery's Drs. Macomson and Vale, and Dr. Coule: "Dr. Macomson is welcome to correct me if I am wrong here but the crux of the matter is actually the suspension and not the termination. The termination had to occur in light of the suspension. This is why Dr. Macomson alone would be the incorrect respondent. It might be time to escalate this because I am not going to go through with a hearing that is futile and HR is mishandling the situation." [Doc. 192-23 Pl. Ex. 172 ECF p. 2]

110. On March 13, 2019, Dr. Kavianpour emailed the interim Vice President of Audit Compliance Ethics and Risk Management, Clay Sprouse to file an "urgent" retaliation and conflict of interest complaint pursuant to AU's Retaliation policy,

for being terminated for engaging in protected activity, explaining the sequence of events that led to the retaliatory termination and she indicated that "Ms. Arnold and Ms. Norton need to be completely removed from the entire process." [Doc. 205-5]

111. Clay Sprouse immediately informed the accused because Debra Arnold sent a text to Susan Norton that same day on March 13, 2019 indicating: "FYI. Sarah Kavianpour filed a complaint on me about the drug testing. Clay Sprouse said he would speak with Becky since she is scheduling the grievance. I'm sure he'll speak with you also." [Doc. 209-10]

112. On March 14, 2019, AU Legal Counsel Chris Melcher sent an email that did not include Dr. Kavianpour or relayed to her about the two separate appeal rights: Dr. Kavianpour should have a GME appeal for the suspension of privileges and, <u>after that</u>, the termination as an employee; [Doc. 192-23 Pl. Ex. 172] – this Melcher email was not shared with Dr. Kavianpour at the time and it was redacted in Open Records provided to Dr. Kavianpour in January 2020, [Doc. 201 at 155:12-159:2; Doc. 201-41 Pl. Ex. 243 (redacted version provided in Open Records); Doc. 201-32 Pl. Ex. 172 (unredacted version from discovery)] even though privilege did not apply Melcher, an unbarred in-house counsel. [Doc. 193 at 86:24-87:15]

113. The unlawful redaction prevented Plaintiff from raising the fact that she was owed a GME appeal for the suspension in her First Amended Complaint in April 2020 because she got the Melcher March 14, 2019 email for the first time in discovery in October 2021.

114. That email by in-house counsel for AU, Melcher, would have informed Dr. Kavianpour that "AUMC and [BOR's] GME have exclusive authority over credentials and privileges for residents." [Doc. 192-23].

115. A meeting was held on March 14, 2019 about Dr. Kavianpour's appeal rights that Dr. Kavianpour sought to get clarifications on among the implicated AU and AUMC officials and the participants that were deposed like Enterprise VP of HR Susan Norton and AU's in-house counsel, Greg Bryan do not recall any details of the meeting.

116. Nobody told Dr. Kavianpour about her appeal rights and HR proceeded as they had originally planned before the suspension-termination of February 21, 2019.

117. Dr. Kavianpour was harmed by not informing her and not providing her contractual required GME grievance through HS 13.0 because the HR grievance process could not reinstate her resident privileges – something that AU and AUMC's agents knew and sought to avoid.

118. On March 15 and 16, 2019, when Dr. Kavianpour inquired about a GME hearing consistent with contractual AU House Staff policies and ACGME requirements, where she quoted the ACGME requirement for due process for institutional and program decisions, the GME Manager Henderson simply responded with HS policy 13.0 and then ignored Dr. Kavianpour's follow-up email about the implementation of that policy. [Pl. Ex. 161; Doc. 208-8 Pl. Ex. 390; Doc. 228-21 Pl. Ex. 321].

119. On March 22, 2019, Dr. Kavianpour received a grievance hearing run by the Human Resources Department for the termination from the residency program, **not** the suspension of clinical activities by Dr. Coule/AUMC. [Doc. 178-12 March 2019 Grievance Hearing transcript, 156:10-24; Doc. 186-12 Pl. Exhibit 13 SMK 002078 April 15, 2019, Henderson email]

120. To this day, Plaintiff has not received any process for the suspension of her clinical privileges by Defendant Coule.

**Issues with the March 2019 HR hearing**

121. AU GME Manager Henderson admitted in an email that a resident had never been provided an HR hearing before. [Doc. 187-13 Pl. Ex. 172 BOR0007551 ECF p. 1; Doc. 194-25 Pl. Ex. 229 BOR0035149; Doc. 195 Norton Mar. Dep. 53:6-58:11, 59:11-62:20; Doc. 186-12 Pl. Ex. 13]

122. On March 4, 2019, Dr. Kavianpour filed a grievance statement with the HR Department because her Notice of Discharge [Doc. 192-4] and Dr. Vale's Decision letter [Doc. 192-21 ECF p. 35] (there is evidence that both letters were written by HR's Norton and Arnold) instructed her to do so.

123. "Dr. Kavianpour submitted a notice of grievance on 3-4-2019, contesting her discharge in that it was unreasonably harsh given her prior history of compliance, negative results, and that her inability to comply with the last test day was an inadvertent circumstance beyond her control" [Doc. 194 at 266:12-18; Doc. 186-7] because the "only consequence" Dr. Kavianpour received about HR's Norton ad hoc drug testing protocol from the memo was that "[s]hould any test return as positive, you will be subject to immediate termination." [Doc. 190 at 159:14-160:13; Doc. 192-1 (memo)]

124. Dr. Kavianpour's grievance statement was shared with HR's Norton, Arnold, and Dr. Macomson, whom Norton selected to be the Respondent/prosecutor.

125. The implicated HR officials Norton and Arnold used Dr. Kavianpour's grievance statement to write the Respondent's statements and questions for the hearing, and to select Respondent witnesses to mount an offense against Dr. Kavianpour, which she was not aware of until the hearing; for example, Drs. Macomson and Coule reversed her pre-employment appeal, and at the March

2019 hearing erroneously referred to the canceled test as "positive," which prevented Dr. Kavianpour from educating the panel about the relevant laws related to the pre-employment situation.

126. On about March 19, 2019, Dr. Kavianpour provided her Grievant witness list to the Hearing Officer Kay Roland, who shared it with the implicated HR officials Norton and Arnold and their designated Respondent, Dr. Macomson.

127. HR was supposed to arrange and ensure that Dr. Kavianpour's witnesses, as a Grievant, would appear and testify at the hearing, but did not arrange the appearance of Dr. Sparks, the third-year resident who did not help or take the pager on February 13, or Dr. Moore, whom Dr. Kavianpour had disclosed as a witness to offer for submit daily drug tests if it was arranged to be at a time that did not interfere with her clinical responsibilities.

128. Dr. Sparks had given a statement in support of the Respondent, Dr. Macomson, but did not appear at the hearing, even though Dr. Kavianpour specifically requested it, so she could not cross-examine him, and the Hearing Officer Kay Roland precluded any questions from other witnesses about Dr. Sparks' credibility.

129. At the March 2019 hearing, Dr. Kavianpour did not bring up the details of her ongoing protected activity (January 22, 2019 and January 31, 2019 emails) out

of fear of further retaliation but also at the pre-hearing meeting the Hearing Officer, Kay Roland, prohibited it at the pre-hearing.

130. On February 21, 2019, Debra Arnold had Dr. Kavianpour's email access removed almost an hour before presenting Dr. Kavianpour with the suspension and termination letters; on March 4, 2019 Arnold did not provide Dr. Kavianpour with a copy of her January 31 email [Doc. 186-11 p. 1] when she requested it, and on March 11 and 12, 2019 Debra Arnold banned Dr. Kavianpour from campus, requiring Dr. Kavianpour to request any evidence that Dr. Kavianpour seeks to be obtained through Debra Arnold.

131. The rationale for Dr. Coule's decision was never provided to Dr. Kavianpour and Dr. Kavianpour found out for the first time that Dr. Coule regarded her as having a substance abuse disorder at the March 2019 hearing and Dr. Kavianpour had not had an opportunity to prepare for that and Kay Roland the hearing officer allowed Dr. Coule to speak freely about that but forbade Dr. Kavianpour to cross him because she kept repeating that they are not here to review the suspension (even though that was the cause of the termination).

132. At the pre-hearing, the Hearing Officer, Kay Roland, and HR's Renee Wray told Dr. Kavianpour that her parents could come to the hearing to support her, but on the day of the hearing when her parents came, they prohibited their

attendance, so they sat in the waiting room where Dr. Coule announced that the grievance hearing was a waste of time and a waste of money because it was a done deal.

133. On March 26, 2019, the HR grievance panel made a recommendation to uphold Dr. Kavianpour's termination, stating that, "grievant has shown a pattern of passive unwillingness," where "[n]egative results from the subsequent random tests are inconsequential as this was an ongoing program initiated as a condition of hire." [Doc. 186-7]

134. Dr. Kavianpour had not received any type of notice during hiring that monthly drug tests were a condition of her hiring and the monthly drug tests were not initiated when she was hired.

135. HR's notes on August 21, 2018 indicate in part: "When Sarah Kavianpour came in for 2nd test - she should have been notified at that point. 1st test – questionable 2nd test -fine." [Doc. 208-10 Pl. Ex. 412 at p.1 BOR 65731]

136. Upon information and belief Susan Norton, who was implicated in Dr. Kavianpour's complaints and had a self-interest in upholding the termination in order to continue to cover up her mistakes, wrote the grievance panel recommendation.

137. Enterprise VP of HR Susan Norton, who no longer works for Defendants, admits now in her deposition that the 2019 HR grievance panel erred when it wrote in its recommendation the "initial agreement" because Norton acknowledged that the August 21, 2018 memo she issued to Dr. Kavianpour, [Doc. 194-1] "was not a written agreement." [Doc. 194 at 267:6-7, 267:23-168:2].

138. Based on its recommendation, the HR grievance panel ignored hearing testimony by the Program Director Dr. Macomson, Program Coordinator Laurel Jones, and Dr. Kavianpour's co-residents, Dr. Todnem and Jones that substantiated the violation of the contractual HS 10.0 policy, [Doc 201-12, SMK005860, ¶15.1(6).] which Dr. Kavianpour raised at the hearing because the lack of intradepartmental policy or procedure prevented her from being able to test on February 13.

139. The. Residency Coordinator Laurel Jones did not help Dr. Kavianpour find coverage on February 13 and Laurel Jones testified at the March 2019 hearing that "[t]here was not a designated person" to help Dr. Kavianpour. [Doc. 178-12 at 231:2-20; Doc. 208-7 at 1].

140. Dr. Macomson admits that Dr. Kavianpour "actually tried to comply, and the door was closed on her" because "she had gone to test [on the morning of

February 14, 2019], which she was not allowed to test per HR, that [on February 13, 2019] she had asked Dr. Sparks to take the pager from her, that, you know, he had refused to help her [by taking the on-call pager]." [Doc. 192 at 115:17-117:21].

141. According to a January 22, 2019 email in which Dr. Kavianpour was not included, Dr. Macomson and Laurel Jones were supposed to be the designated people to help Dr. Kavianpour to present for a drug test, [Doc. 178-20 at 1] and on February 13, 2019, Debra Arnold did not go through them before calling Dr. Kavianpour to present for a drug test as promised in the January 31st memo, [Doc. 186-11 p. 2 ¶ 2] so neither Laurel Jones nor Dr. Macomson helped Dr. Kavianpour present on February 13, 2019. [Doc. 192 at 94:2-17; Doc. 178-12 at 230:15-231:20].

142. Based on its recommendation, the HR grievance panel also ignored Debra Arnold violations of the January 31st memo on February 13, 2019.

143. On April 2, 2019, the AU Provost Caughman adopted the grievance panel's recommendation and recommended that President Brooks Keel uphold Dr. Kavianpour's termination, which AU President Brooks Keel did on April 4, 2019. [Doc. 204-15 Pl. Ex. 213].

144. Dr. Kavianpour was not sent the HR grievance panel recommendation [Doc. 186-7 Pl. Ex. 8 (panel recommendation)] to correct or challenge its basis before it was adopted by AU Provost and President.

145. If Dr. Kavianpour was provided the contractual grievance process under HS 13.0, she would have had the opportunity to correct the misrepresentation before the AU President signed off on her termination because in that process there is an additional step that would have allowed her to receive the panel-based decision and "2.8.3 Inform House Officer of the right to appeal to the President of Augusta University." [Doc. 178-6 (HS 13.0) ECF p. 3]

146. On April 12, 2019, the Office of Legal Affairs of the Board of Regents of the University System of Georgia, granted Dr. Kavianpour an extension for her Application Discretionary Review to be "20 calendar days from the date on which you receive the documents you requested from Augusta University under the Georgia Open Records Act." [BOR0042745-6]

147. Instead of calling Dr. Kavianpour to provide her with a GME hearing, on about April 24, 2019, Mr. Greg Bryan, the in-house counsel at AU, called her to offer her a retroactive resignation, and when she told him that she could not take a retroactive resignation for an illegal termination, he said "a lawsuit would take

three to five years," and she is "hemorrhaging," so a "resignation was [her] best option."

148. Dr. Kavianpour received the documents she requested from Augusta University under the Georgia Open Records Act in January 2020, but USG had allegedly reinstated her, as described herein, so President Keel's April 2019 and June 2020 decisions became finalized together by the Discretionary Review Committee decision that was issued in late August 2020.

**Dr. Kavianpour Was Not Provided Meaningful Notice, Remediation, Or Opportunity As She Was Contractually Entitled To**

149. Augusta University Policy HS 18.0 House Officer Performance "outlines a procedure for monitoring resident performance and remediating it" and Dr. Macomson admits that he is governed by this document regarding how he monitors and remediates resident's performance. [Doc. 192 Macomson Dep. 57:1-15; Doc. 192-20 Pl. Ex. 125 HS 18.0].

150. The Neurosurgery Chair, Dr. Vale, and BOR's 30(b)(6) witness, Dr. Macomson, confirmed that under House Staff Policy 18.0, [Doc. 178-10] residents should be given notice and opportunity to cure any deficiencies or performance concerns. [Doc. 178-1 Macomson 30(b)(6) Dep. at 42:4-11; Doc. 197 Vale Dep. at 27:13-17.].

151. During her residency, Dr. Kavianpour did not receive 360 evaluations before being terminated on February 21, 2019, [Doc. 192 Macomson Dep. 70:25-71:5] where the evaluations could have provided her notice of any deficiencies so that she could cure them.

152. On February 3, 2019, Enterprise VP of HR, Susan Norton forwarded Dr. Kavianpour's January 31 email response in which Dr. Kavianpour questioned the legality of what Susan Norton was doing [Doc. 194 Norton Dep. 176:18-179:15; Doc. 186-11 Pl. Ex. 12 (emails)] to AU Legal Greg Bryan and AUMC Legal Clark Speese and indicated that "Debra was able to get the [January 31 memo] distributed per our meeting. Below is Dr. Kavianpours [sic] response. Perhaps we can discuss next week." [Doc. 186-11 at 1]

153. On February 7, 2019, Dr. Moore indicates that an attached counseling form is "for the resident we recently discussed with HR regarding our on-boarding testing procedures." [Doc. 186-16]

154. On February 8, 2019, BOR's in-house counsel Greg Bryan sent an email reply to GME and Neurosurgery that he "can already sense that we are headed for a rough time with this resident" because of Plaintiff's "objections to this, that, and the other thing," so he wanted them to paper counseling of alleged performance issues. [Doc. 186-16 (email); Doc. 201 at 96:7-99:7]

155. This leads to the one and only counseling form in the record that was "1st Occurrence" on February 11, 2019 and it included a purported remediation plan. [Doc. 192 Macomson Dep. at 62:13-16, 60:11-61:4; Doc. 192-17 Pl. Ex. 99 (the purported counseling form and plan)]

156. The counseling form is a boilerplate or standardized form, so the areas initialed by Dr. Kavianpour were not areas of concern. [Doc. 192 at 63:7-64:2; Doc. 192-17 Pl. Ex. 99 ECF p. 2].

157. The form misrepresents the terms and conditions of Plaintiff's employment and residency from just cause to at-will by including the statement that residents "are ultimately employed at their [AUMC's] discretion," [Doc. 192-17 Pl. Ex. 99 ECF pp. 1-2] in violation of the affiliation agreement, the "Terms and Conditions of Housestaff Service to AU Health" [Doc. 178-13 ¶¶ 6b, 9 ECF pp. 3-4] and the notice and opportunity to cure provisions of contractual HS policy 18.0. [Doc. 192 Macomson Dep. 57:1-15; Doc. 192-20 (HS 18.0); Doc. 178-1 Macomson 30(b)(6) Dep. at 42:4-11; Doc. 197 Vale Dep. at 27:13-17.]

158. At the February 11, 2019 meeting where Dr. Kavianpour was presented Pl. Ex. 99, [Doc. 192-17] BOR Defendant sped up the progressive discipline process in violation of HS 18.0 policy and written contract by simultaneously providing

papers for “Verbal Counseling 1st Occurrence” and “Resident Remediation Plan.”

159. Augusta University HS Policy 18.0 “House Officer Performance” requires documented counseling sessions for any performance problems. See § 2.1. According to § 2.2, “[i]f, after documented counseling …“performance does not improve then formal remediation must occur as stated and outlined in § 2.3, which is at least “three months” with “at least once a month” follow-up per § 2.4, then a decision for nonrenewal could be made per § 2.5. HS Policy 18.0. AU HS Policy 18.0 § 2.3.2 required that the duration of remediation be “at least three months.” [Doc. 178-10 (HS Policy 18.0)]

160. Dr. Kavianpour was deprived of the initial opportunity to cure by omitting steps when the Neurosurgery Department included a “Resident Remediation Plan” (SMK 2337-2338) with the “Verbal Counseling 1st Occurrence” form on February 11th, 2019. Then Dr. Kavianpour was deprived of subsequent opportunity to cure because she was fired 10 days into the remedial period and without working/training in-between a decision of non-renewal occurs in 2020, which is the basis for the ACGME citation in 2021 about Dr. Kavianpour. [Doc. 171-2, BOR 66744-5]

161. In addition to deviating from HS 18.0, the purported counseling process on February 11, 2019 [Doc. 192-17] was also a deviation from the process established under HS 13.0.

162. According to Augusta University House Staff Policy 13.0 § 2.0, "the Following policy and procedure applies to all House Officers in Training and will be followed by officials for each Program evaluating House Officers for promotion or for disciplinary actions." [Doc. 178-6 ECF p. 1 (underline emphasis added)]

163. According to Augusta University House Staff Policy 13.0 § 2.1, "Each Residency Program shall have Clinical Competency Committee (CCC) … The CCC shall have the following functions:

- To certify that House Officers have met the academic criteria for promotion;
- To periodically review the performance and academic progress of House Officers;
- To recommend feedback and counseling as needed to correct deficiencies;
- To recommend non-renewal or remedial action for House Officers who have failed to make adequate academic progress;

- To recommend disciplinary action, including dismissal, of a House Officer who has violated any applicable Law or policy, or otherwise failed to meet the criteria for continued employment according to academic and non-academic guidelines.

[Doc. 178-6 ECF p. 1]

164. On February 11, 2019, the purported counseling and remediation plan provided to Dr. Kavianpour was not an "evaluation" process determined by a Clinical Competency Committee (CCC) as required under HS 13.0 because a CCC had not "review[ed] the performance" of Dr. Kavianpour to "recommend feedback and counseling" or recommend "remedial action." [Doc. 178-6 (HS 13.0)]

165. There were no deficiencies in Dr. Kavianpour's academic or clinical performance to warrant a CCC process, otherwise, that process would have been (or should have been engaged if there were real issues) during the course of her patient care delivery from July 12, 2018 through February 21, 2019 and Plaintiff was scheduled to take the most overnight calls of the junior residents in March 2019. [Doc. 228-8]

166. The determinations to start the documented "counseling" process on February 11, 2019 were made by in-house counsel Greg Bryan who said he

"can already sense that we are headed for a rough time with this resident" because of Dr. Kavianpour's "objections to this, that, and the other thing." [Doc. 201 at 96:7-99:7; Doc. 186-16 (email)]

167. The February 11, 2019 "Resident Remediation Plan" included information about a follow-up "formal meeting...in six weeks," which was "[t]entatively set for Friday, March 29, 2019 @ 9:00 am" and a "formal meeting...in 12 weeks...to discuss overall feedback, evaluation and plan of action moving forward," which was "[t]entatively set for Friday, May 10 @ 9:00 am." (SMK 2338). None of these subsequent meetings occurred, let alone the required opportunity to cure any alleged issues. [Doc. 230-3 Kavianpour 08/05/22 Decl.¶ 49; Doc. 192-20 Pl. Ex. 125 HS 18.0].

168. Dr. Macomson did not meet with Dr. Kavianpour about the progress of the remediation plan. [Doc. 178-1 Macomson 30(b)(6) Dep. at 180:22–181:11; Doc. 192-17 Pl. Ex. 99].

169. Dr. Macomson admitted that Pl. Ex. 99 [Doc. 192-17] from February 11, 2019 is the only remediation plan provided to Dr. Kavianpour. [Doc. 192 Macomson Dep. at 60:11-61:4].

170. Dr. Kavianpour was not permitted the full twelve weeks identified in her February 11, 2019 counseling and remediation plan documents. [Doc. 197 Vale Dep. at 116:23-117:20].

171. Dr. Macomson admitted that Pl. Ex. 99 [Doc. 192-17] "was signed about 10 days before [Dr. Kavianpour] was terminated. The only incident that you're [Dr. Macomson was] aware of that happened after this form was signed was her not appearing within a time frame that Human Resources told her she needed to for a drug test." [Doc. 192 Macomson Dep. at 65:10-66:9].

172. After personally reviewing Dr. Kavianpour's file, Dr. Vale, the Neurosurgery Chair, testified that from the time Dr. Kavianpour received the counseling form on February 11, 2019 giving her a three-month remediation period, to the date of her discharge on February 21, 2019, there was no patient safety concern or incident that arose that would have justified cutting short the three-month remediation period. [Doc. 197 Vale Dep. at 169:16-170:8.].

173. Enterprise VP of HR, Susan Norton, admits that she knew in advance that Dr. Kavianpour could not remediate or continue in her residency and that suspension of her privileges would lead to her termination; there was a "coordination of her suspension and her termination, that was occurring all at the same time." [Doc. 194 Norton Dep. at 90:8-15, 90:21-91:3, 92:9-15].

174. Dr. Kavianpour's remediation was cut short after ten days because of the February 2019 suspension and termination and a decision of non-renewal approximately nine months later that also deviated from policy and contract, resulting in an ACGME citation to the school about Dr. Kavianpour. [Doc. 171-2, BOR 66744-5 ("Information concerning the remediation provided to Dr. Kavianpour does not substantially document compliance with Sponsoring Institution's policy addressing the nonrenewal of resident appointments."); Doc. 178-1 Macomson 30(b)(6) Dep. 130:1-7; 130:22–131:16].

175. According to BOR's 30(b)(6) witness, Dr. Macomson, the December 3, 2021 ACGME citations were issued [Doc. 171-2, BOR 66744-5] because "ACGME has determined that the neurosurgery department had violated House Staff Policy 18.0 relative to how Dr. Kavianpour was dismissed originally and/or dismissed again at the reinstatement." [Doc. 178-1 Macomson 30(b)(6) Dep. 130:1-7; 130:22 – 131:16].

176. Defendants' Designated Institutional Officials Drs. Hocker and Savage shared Augusta University HS Policy 18.0 and 13.0 and documents about the processes provided to Dr. Kavianpour for an ACGME investigation, [Doc 196-1; Doc. 171-6] which the ACGME academicians and subject matter experts used to make determinations that substantiated Dr. Kavianpour's complaints about how

Defendants did not follow their own HS 18.0 and HS 13.0 policies when they did not provide Dr. Kavianpour remediation and then suspend, terminated, and issued an inapplicable non-renewal in 2020. [Doc. 196-2 Pl. Ex. 342, BOR0040851(November 11, 2020 ACGME letter); Doc. 171-1 Pl. Ex. 394 (August 4, 2021 ACGME letter); Doc. 171-2, BOR 66744-5 (December 3, 2021 ACGME NEW CITATIONS letter).].

**Belated GME Processes in 2020 Were Futile By Design and Did Not Review the Suspension of Clinical Activities By Dr. Coule**

177. Dr. Kavianpour's contract required a GME hearing during her contractual period and none occurred before July 2019, despite Plaintiff's repeated requests in March 2019 that were ignored. [Doc.194-25 Pl. Ex. 229; Doc. 228-21 Pl. Ex. 321 at BOR0002388 ("It appears that Dr. Kavianpour is inquiring about whether she may file a grievance through the GME Office."); Doc. 208-8 Pl. Ex. 390 ("the simplest thing to do would be to forward a copy of our due process policy to her"); Doc. 208-5 Pl. Ex. 195 at BOR0002670-1; Doc. 216 Kavianpour Decl. p.8 ¶¶ 40-42]

178. It was ongoing retaliation by BOR when it did not provide Dr. Kavianpour a grievance process pursuant to HS 13.0 that she was entitled to under the terms of her contract.

179. When asked why BOR did not offer her a timely GME process, BOR's 30(b)(6) witness Melcher testified that Dr. Kavianpour's alleged pre-termination "actions" were the reason. [Doc. 193 Melcher 30(b)(6) Dep at 84:10-85:8 (BOR officials were thinking "very carefully about how would we move forward to give her an appeal right that made sense" because "her actions put her in this place, that she had failed to comply with the testing protocol")]

180. On November 4, 2019, Dr. Kavianpour made a last attempt before filing her lawsuit when she emailed GME's Dr. Moore and Neurosurgery's Dr. Vale demanding a GME hearing, informing them of violations of "due process," her contract, contractual policies, applicable laws, and ACGME requirements and or discriminating by regarding her as having a substance abuse disorder. [Doc. 228-16 Pl. Ex. 197 ECF pp. 1-4]

181. On November 4, 2019, Dr. Moore forwarded Dr. Kavianpour's email to Greg Bryan, who subsequently forwards it to HR's Susan Norton and Becky Williams (the implicated HR officials who did not inform Dr. Kavianpour of her right to a GME appeal despite being informed by Melcher on March 14, 2019) and in-house counsel Greg Bryan states in part that "we should confer on whether we still want to allow the GME grievance at this late point in time." [Doc. 228-16 Pl. Ex. 197 ECF p. 1]

182. Nobody responded to Dr. Kavianpour's November 4, 2019 email request for a GME hearing, and the substance of her grievance that was detailed in the email was disregarded in the retaliatory process that BOR held after her lawsuit was filed, as described herein.

183. On November 5, 2019, when Clay Sprouse met with Dr. Kavianpour for the first time since he had stonewalled any investigation into Plaintiff's retaliation complaints since March 2019 and was reported for his conflict of interest by the Chief Compliance Officer John Lott to the Office of the President in the July 2019 investigation, but Clay Sprouse had John Lott removed and buried their investigation findings from July 2019.

184. Wesley Horne and USG reassigned the case back to him in late October 2019, but rather than take remedial action because the investigation was complete, at that recorded meeting, Clay Sprouse pretended there needed to be "more work" and finally acknowledged his conflict of interest.

185. Open Record documents including Clay Sprouse's statement and timeline to Wesley Horne in July 2020 showed that the work was done, Dr. Kavianpour expressed that she just "wanted her job back," which Wesley Horne confirmed in his notes. [Doc. 203-30]

186. On November 20, 2019, Dr. Kavianpour had a two-hour in-person meeting with USG officials, Wesley Horne and Dr. Juanita Hicks, during which Dr. Kavianpour detailed the violations of policies and procedures and applicable laws for a USG Special Review.

187. On November 25 and 26, 2019, Wesley Horne, USG Director of Ethics Compliance, and Juanita Hicks, USG Vice Chancellor of Human Resources, had interview meetings with various AU and AUMC officials (Susan Norton, Debra Arnold, Philip Coule, Laurel Jones, and Clay Sprouse) "regarding Sarah Kavianpour." [Doc. 228-13 ECF p. 2]

188. Susan Norton signed up for the last time slot: "Tuesday, November 26" at "3pm – 4 pm Ms. Susan Norton." [Doc. 228-13 ECF p. 3]

189. Susan Norton knew since early March 2019 about Dr. Kavianpour's complaints about the inadequate appeal process because she was in most of the communications and if she was not the other officials made her aware of Dr. Kavianpour's emails like Sprouse or Dr. Coule's agent, so it was foreseeable that Dr. Kavianpour would bring that up with the USG officials, especially since Dr. Kavianpour had sent an email earlier in November that informed Susan Norton and Greg Bryan that the HR grievance procedure was not her contractual grievance procedure. [Doc. 228-16 ECF pp. 1-2]

190. In anticipation of her meeting with USG officials about Dr. Kavianpour, on November 25, 2019, Susan Norton emailed in-house counsel Melcher admitting that HS Policy 13.0 [Doc. 178-6] was "set up to cover both academic and non-academic matters" which was "intended to be the due process for our residents and fellows" and Susan Norton was conceding that the use of the HR grievance process was "incorrect" for residents like Dr. Kavianpour. [Doc. 228-13 ECF pp. 1-2]

191. USG Director of Compliance, Wesley Horne's notes of the November 26, 2019 interview with CMO, Dr. Coule, about Dr. Kavianpour [Doc. 203 Horne Dep. 289:23-292:18] state in a pertinent part:

> **Can Decision be Appealed**
> · Yes, can go through the GME review process
> **Going forward:**
> Better define the process for suspension and that gets resolved on the employment side

[Doc. 165-2 Pl. Ex. 164 (bold original)]

192. Debra Arnold's handwritten notes of the December 11, 2019 meeting provide additional details compared to Susan Norton's, [Doc. 178-16] indicating in relevant part:

> Separate from employment appeal to BOR.
> SK as a resident entitled to employee & student appeal process.
> P. Coule ee [employee] of the state.

…
hold in abeyance employment appeal
suspended her privileges
we should not have terminated
allow her to go thru house staff grievance process
…

[Pl. Ex. 413, BOR0065927, p. 4]

193. USG officials who instructed AU officials to reinstate Dr. Kavianpour withheld the documented findings of the compliance investigations and did not tell the decision-makers that substance abuse policies had been violated in the manner of testing Dr. Kavianpour.

194. When questioned about the alleged reinstatement, BOR's 30(b)(6) witness Melcher asserts that they "determined that she [Dr. Kavianpour] needed to be afforded a better process for both her academic and employment appeal" and they "concluded that she had not been given enough information about her appeal rights." [Doc. 193 at 80:11-81:12].

195. BOR's 30(b)(6) witness Melcher admits there were "flaws in the way [. . .] her appeal rights were originally handled;" and according to him, Dr. Kavianpour "had to be reinstated so that she could pursue the Housestaff [. . .] Policy 13.0 appeal rights," including clinical competency committee review and ad hoc committee review. [Doc. 193 at 83:16-25.]

**The January 2020 Non-Renewal**
**Defendants Subject Dr. Kavianpour To Another Adverse Action and Deprivation of Property Interest**

196. After the filing of the lawsuit, on December 16, 2019, Dr. Moore called Dr. Kavianpour and set up a conference call that indicated that there "are five participants on the call including you" and only Drs. Moore, Wesley Horne and Dr. Hicks identified themselves as being on the call (in-house counsel Chris Melcher was secretly on the line). [Pl. Ex. 238 SMK 19329-40]

197. During that recorded conference call of December 16, 2019, Dr. Kavianpour specifically requested the informal process that is available under HS 13.0, which was ignored, [Doc. 178-6 (under 2.0 Procedure it states "NOTE: House Officers are encouraged to attempt to first resolve any grievance informally by meeting with the appropriate Program Director or Department Chairperson.")] she asked for meaningful notice ("what are we trying to address in 30 minutes?") but Dr. Moore did not really explain what was to be discussed and the USG investigation was "put on hold."

198. Dr. Kavianpour asked, "So I'm being allowed a due process for the suspension?" to which Dr. Moore responded "Yep" and when she asked again "So this clinical competency committee is for the suspension then?" he said "Correct."

199. Dr. Kavianpour also asked, “So the cat is out of the bag, so I’m guessing there’s other terms and conditions that have to be discussed among the lawyers. Is that correct? Does anyone -- DR. MOORE: -- Well, with this Policy 13, there’s really no need to involve them.”

200. On December 16, 2019, Dr. Kavianpour received a letter signed by Dr. Macomson that claims they reinstated her to hold GME hearings outside Dr. Kavianpour’s contractual period. [Doc. 192-25]

201. BOR made a unilateral determination for purported “reinstatement,” where Dr. Kavianpour was retroactively ‘reinstated as an employee’ of AU in her previous role and would receive “backpay” from the date of termination, however her suspension would remain in effect and she would still not be able to enter AUMC premises.

202. Plaintiff was not returned to her clinical activities to finish her first year of training, which a resident would ordinarily be able to do when a non-renewal is issued), so that damage is the same, as pled in Plaintiff’s FAC: Had Plaintiff been permitted to complete her first post-graduate year of training at AU, she would have been eligible to obtain her own medical license and work independently or as a contract physician.

203. None of the entities (George Composite Medical Board, American Board of Neurological Surgery, and ACGME) that were informed of her termination were informed of the purported "reinstatement."

204. Although Dr. Kavianpour complained that the reinstatement did not come with a contract for employment or mutually agreeable terms, she did not reject the reinstatement per se.

205. The hearing was supposed to be a GME appeal for the suspension by Dr. Coule. [Doc. 192-25 Pl. Ex. 177 ECF p. 1 (12/16/19 letter); Doc. 178-16 at ECF pp. 1-2 (Norton notes on 12.11.19: "Ultimate Authority is the State… Interpretation by USG is that the letter from Dr. Coule notifying her of "suspension" is that she should have been given rights under [HS policy] 13.0…"); Doc. 194 Norton Dep. 226:23-229:20]

206. Instead of providing an appeal for Dr. Coule's suspension as instructed by USG officials on December 11, 2019, the "reinstatement" was to paper a GME hearing as they "submit another recommendation for her termination." [Doc. 192-26 Pl. Ex. 178 (Laurel Jones email on December 16, 2019].

207. On December 30, 2019, Mr. Ed Buckley, attorney for Plaintiff, wrote a response letter to Dr. Macomson and representatives seeking meaningful notice

of the hearing substance, turning down the offer for a hearing, and suggested an informal process consistent with HS 13.0. [Doc. 208-11 ECF p. 9]

208. On January 7, 2020, approximately thirty minutes before the CCC hearing, BOR's attorney Bryan Webb wrote a letter indicating that Dr. Kavianpour was to "appear before the CCC to answer questions regarding her past behavior and any concerns regarding her clinical or professional competency." [Doc. 208-11 ECF p. 9-10]

209. Because of the lack of meaningful notice, on advice of counsel, Dr. Kavianpour did not attend the CCC meeting of January 7, 2020 (and she was not informed of the CCC meeting of January 9, 2020 at all) – both of which were held about Dr. Kavianpour, without Dr. Kavianpour, against her consent, outside of her contractual period, and not pursuant to a grievance filed by her.

210. Instead of following the instructions provided to them on December 11, 2019 by USG officials to provide an appeal for the CMO suspension, AU officials used the CCC process in a retaliatory fashion to paper a record about Dr. Kavianpour who had been fired and not working there since February 21, 2019.

211. On January 9, 2020, the committee took another adverse action against Plaintiff by issuing a recommendation of nonrenewal for a fictitious or non-existent "contract, which expires 6/30/2020" based on a subjective reason that

"Dr. Sarah Kavianpour is not a good fit for our program." [Doc. 201-43 Pl. Ex. 245 ECF p. 3-4 (CCC minutes)].

212. None of the reasons set forth in the CCC recommendation or at the CCC hearing in January 2020, [Doc. 201-43 Pl. Ex. 245 ECF pp. 3-4 (CCC minutes)] were brought up before in Dr. Kavianpour's original hearing in March 2019, even though Dr. Macomson testified that he had the opportunity to do so and could have because he was at the March 2019 hearing, [Doc. 192 Macomson Dep. at 188:19-189:6], and Dr. Macomson was assigned the role of the prosecutor for the March 2019 hearing. [Doc. 178-1 Macomson 30(b)(6) Dep. at 74:15–75:6].

213. At the March 2019 hearing, Dr. Macomson testified that "If Dr. Kavianpour had complied with the testing requirements, then no adverse action would have been taken," [Doc. 178-12 at 247:24-248:15] Dr. Macomson never told Dr. Kavianpour before or at the time of her termination that her academic or clinical performance had anything to do with the suspension and termination, and he further explained that it had been Dr. Coule's decision that he purportedly cannot "overrule" and "because he removed her from clinical duties…we can't train her…none of the other stuff has do with why we're here today." [*Id.* at 385:10-386:1]

214. None of the purported "issues" raised in the CCC/Ad Hoc were based on Dr. Macomson's personal or firsthand knowledge [Doc. 192 Macomson Dep at 201:16-202:18] and Dr. Macomson never forwarded the "emails" to Dr. Kavianpour, which he used to allege "performance" issues at the CCC in January 2020, [Doc. 178-1 Macomson 30(b)(6) Dep. 186:23–187:6] for meaningful notice or opportunity to cure at the time of her residency.

215. Even though it is an ACGME-accredited residency program, the CCC and Dr. Macomson did not even attempt to adhere to best practices detailed in the ACGME CCC guidebook.

216. The CCC recommendation piled on falsified "issues" and false statements that not discussed at the CCC hearing because they are not reflected CCC minutes.

217. Even though Dr. Kavianpour had been fired in the meantime, the CCC of January 2020 brought up things that were not in the February 11, 2019 alleged counseling form. [Doc. 192 Macomson Dep. at 187:1-187:20; Doc. 192-17 Pl. Ex. 99 ("counseling"); Doc. 192-15 Pl Ex. 55 (CCC recommendation)].

218. Laurel Jones wrote the CCC recommendation letter dated January 11, 2020 and Dr. Rahimi signed it for non-renewal – a different adverse action rather than reviewing the previous adverse actions that BOR alleged the GME process was going to do in the December 16, 2019 letter. [Doc. 192-25 Pl. Ex. 177 ECF p. 1]

219. On January 11, 2020, the CCC issued a recommendation to Dr. Macomson that used the suspension by Dr. Coule on February 21, 2019 as a basis for its decision, [Doc. 192-15 Pl. Ex. 55 ECF p. 1 ("violations of professional conduct include …8 suspension of all clinical duties by the CMO")] so the CCC was not an appeal for and did not provide a review of Dr. Coule's suspension and the basis for Dr. Coule's decision.

220. Rather than providing an appeal process she was entitled to for the non-academic suspension-termination of February 21, 2019, the CCC recommendation attempts to shift a non-academic dismissal to create the appearance of also an academic dismissal, providing other false reasons that were never raised before or were previously non-issues, and it still relied on same flawed reasons as before for its action: the suspension by Dr. Coule and misrepresentations about the substance abuse policies.

221. The CCC recommendation attempts to falsify a record of progressive discipline by misrepresenting the first verbal counseling on February 11th [Doc. 192-17] as probation [Doc. 192-15 ECF p. 4 (CCC rec)] but Dr. Macomson admits that Plaintiff was never placed on probation. [Doc. 178-1 Macomson 30(b)(6) Dep. 174:14–175:9; 178:25–179:8]

222. On January 16, 2020, Dr. Macomson sent Dr. Kavianpour a letter accepting the CCC's decision for nonrenewal of an expired contract or a "contract, which expires 6/30/2020," [Doc. 201-43 ECF p. 3] where there is no such contract.

223. Dr. Macomson admits that by December 2019, Dr. Kavianpour was no longer under contract because she had been terminated and he made no inquiry in December 2019 or January 2020 about whether Dr. Kavianpour had been given a written contract for purported reinstatement and subsequent non-renewal of it. [Doc. 178-1 Macomson 30(b)(6) Dep. at 37:10-22].

224. Augusta University's House Staff Policy 13.0 § 2.2.1 requires "[r]ecommendations of nonrenewal must be made at least four months before the end of the current contract period." [Doc. 178-6 ECF p. 1 (HS 13.0)]

225. Dr. Kavianpour was never provided a contract that extended past July 09, 2019. [Doc. 178-5; Doc. 190 Kavianpour Vol II Dep. 216:1- 7.]

226. The House Officer Notice of Appointment is designed to fulfill the ACGME requirement that all residents be given a written contract with the terms and conditions of their residency employment. [Doc. 178-1 Macomson 30(b)(6) Dep. at 33:12-18, 37:15-18].

227. On January 23, 2020, Dr. Kavianpour sent a letter of response to Dr. Macomson to suspend the non-renewal process pending litigation because she

is not under contract, does not have health insurance, and she will have to contact the Accreditation Council for Graduate Medical Education (ACGME) about the CCC process and recommendation about her in 2020, however, on January 24, 2020, Dr. Macomson responded that they "will continue to proceed" and consider her letter to request for an Ad Hoc Committee.

228. In-house counsel Melcher handpicked the committee chair and orchestrated the next steps and there is a January 31, 2020 email indicates in a pertinent part:

> Mr. Melcher is now officially advised of this ad hoc committee being established with members names and departments with Dr. Hocker as the ad hoc committee Chair.
> Dr. Seehusen has been accepted by Mr. Melcher as the GME Office administrative lead for this ad hoc committee

229. On February 5, 2020, Mr. John Batson, attorney for Dr. Kavianpour wrote a letter to AU Legal Chris Melcher and other representatives of Defendants that any written contract expired, there has been no mutual agreement as to the terms and conditions of any hearings, the processes have been flawed, noncompliant with ACGME requirements, and further retaliatory treatment. [Pl. Ex. 419 at SMK 2322].

230. In January and February 2020, Dr. Kavianpour filed USG hotline complaints indicating in a relevant part that "AU is holding retaliatory hearings to pile on issues irrelevant to my dismissal to cover for misconduct by AU officials" and

she emailed Dr. Hicks to reopen the USG Special Review of her retaliation complaints that they "paused" on December 16, 2019 because the hearing that occurring was taking another retaliatory adverse action rather than a review of the previous one that she was entitled to, but she was ignored and Dr. Kavianpour's compliance hotline complaints were also being closed because "the hotline, etc. are available remedies except as it relates to a matter under litigation / appeal" even though they had purported reinstated her as their student and they were mishandling the appeal that she was supposed to be provided.

231. On February 12, 2020, in-house counsel Melcher emailed GME officials that states in part:

> We have discussed next steps with the AG. Would you please provide me draft of letter that you on behalf of the Ad Hoc Committee would "normally" send to Kavianpour informing her of the date, time, and location of the hearing on her appeal? The letter might also briefly refer her to the House Staff Policy 13.0 (again), and remind her of her right to appear with an advisor and present evidence. If you can send me draft sometime tomorrow (earlier is better) will review, provide comments, and finalize tomorrow.
> Once that letter is finalized (and signed), we will give it to the AG to deliver it to her attorney (tomorrow or Friday), along with a second letter from the AG saying that MCG is moving ahead with House Staff Policy 13.0 and the AHC process, <u>with or without her participation, per the policy and will afford her all rights and due process if she chooses to participate</u>. The <u>AHC will then move forward with the hearing with or without Kavianpour</u>, review the evidence and the arguments, discuss the matter, and deliver a recommendation to the Dean. I am available

> by phone or in person to answer questions or provide any further advice or support.

[BOR0040640-1 (emphasis added to the deviations from HS 13.0 policy)].

232. HS Policy 13.0 does not permit unilateral determinations to move ahead with the AHC process with or without the resident, so it is not "per policy" as falsely alleged – that step of the policy states:

> 2.4 The House Officer shall have 10 days to file a request for hearing.
> 2.4.1 Request for hearing shall be in writing;
> 2.4.2 Shall state the reason(s) for request with a complete description of the basis for the grievance

[Doc. 178-6]

233. On February 18, 2020, GME Coordinator, Erica Bass, emailed Dr. Macomson, to ask: "Do you know if Kavianpour is planning on attending? It is my understanding that she does not consider herself under contract and is not going to participate," and Dr. Macomson replied, "No, I do not believe she is coming. This is just a procedure for sure." [Pl. Ex. 337, BOR0028888]

234. On about February 24, 2020, Dr. Kavianpour sent an email to Defendants' agents and ACGME about the "[i]ntentional violation of ACGME requirement for a resident contract":

> I do not have a written contract that "directly contains or "provide[s] a reference" to a duration that extends past 07/09/19. Despite numerous requests that a contract for my reinstatement period (July

> 2019-July 2020) be sent to me that conforms with ACGME policies (IV.B.), Mr. Chris Melcher has refused to provide such a contract despite repeatedly stating that I have been reinstated and referring to me as "a student, a resident, an employee. …

[Pl. Ex. 199 BOR0028211-2]

235. The issues that Dr. Kavianpour raised were not corrected, but in a phone call conversation with Dr. Moore in about January or February 2020, Dr. Moore told Dr. Kavianpour that the process would give the AU President Keel a chance to fix the situation.

236. Dr. Seehusen, who was in charge of running the Ad Hoc process, shared Dr. Kavianpour's documents with Dr. Macomson and the committee in advance but told them it was not obvious to him that they were relevant to their discussion.

237. The email documents that Dr. Macomson relied on to make allegations about Dr. Kavianpour were never with Dr. Kavianpour during her residency and they were not shared with her before or after the CCC, despite her Open Records request seeking the information prior to the Ad Hoc hearing; in-house counsel Greg Bryan withheld the email documents from the Open Records response – this was also a violation of HS 13.0 policy requirement that "2.6.4 All parties shall receive adequate notice of charges and opportunity to present evidence." [Doc. 178-6 (HS 13.0) ECF p. 2]

238. On April 28, 2020, an Ad Hoc Committee meeting was held via ZOOM. [BOR0042608-42730]

239. Because she did not want to waive an administrative appeal and out of concern that Defendants would later indicate that she failed to exhaust her administrative remedies, Dr. Kavianpour made an appearance to inform the committee that she not under contract, the Ad Hoc was not because of a request or grievance by her, and that it was a deviation from the progressive discipline process required under the expired contract, including the lack of notice or opportunity to cure as required under HS 18.0.

240. Dr. Seehusen, who was running the Ad Hoc hearing, did not allow Dr. Kavianpour hear the instructions provided to the Ad Hoc Committee.

241. On April 29, 2020, in an email to Erica Bass, Dr. Kavianpour informed the GME off that "If the committee wishes to genuinely make an informed decision am open to meet with them again to go over all the documents and my answers to the CCC recommendation since Dr. Seehusen's February 13 2020 and April 15 2020 letters said that the "purpose of the meeting is to provide the committee the opportunity to review all information related to the decision process that resulted in the recommendation," " but that did not occur because that was <u>not</u> the purpose of the meeting.

242. Under the HS 13.0 policy, "2.6.1 Parties may request removal of an AHC [Ad Hoc Committee] member for cause." [Doc. 178-6 (HS 13.0) ECF p. 2]

243. Before the scheduled Ad Hoc hearing, Dr. Kavianpour requested that Dr. Michael Hocker recuse himself for cause, providing details of the conflict of interest, which was ignored, and then again on April 29, 2020, when Dr. Kavianpour reminded GME officials of the request and re-requested that Dr. Hocker recuse himself.

244. On May 1, 2020, the Ad Hoc Committee Chair Dr. Hocker signed a report and recommendation that adopted the CCC recommendation to Dean Hess to uphold the Program Director's decision. [BOR0042732-4]

245. The AHC recommendation was essentially the CCC recommendation copied and pasted and without any explanation it disregards all evidence and testimony by Dr. Kavianpour contrary to their position or her witness, John Lott, who was Defendants Chief Compliance Officer who investigated the matter and his findings that were corroborated by subsequent USG investigation, which are documented in Wesley Horne's notes.

246. The Ad Hoc recommendation used the suspension by Dr. Coule on February 21, 2019 as a basis to uphold the non-renewal [BOR0042732-4 ("f. Suspension

of all clinical duties by the CMO")], so the Ad Hoc hearing was not an appeal for and did not provide a review of Dr. Coule's suspension.

247. The Program Director's decision of non-renewal of an expired or non-existent contract was subsequently upheld by a purported GME Ad Hoc Committee, Dean Hess, President Keel, and USG.

248. On May 5, 2020, Dean Hess upheld the Ad Hoc recommendation. [BOR0042736]

249. On May 19, 2020, Dr. Kavianpour appealed Dr. Hess' decision upholding the nonrenewal to President Keel. [Doc. 204-13 Pl. Ex. 209].

250. On May 22, 2020, President Keel upheld the decision for non-renewal. [BOR0042738]

251. On July 20, 2020, in-house counsel Greg Bryan wrote a letter to Edward Tate, Vice Chancellor for Legal Affairs of the Board of Regents of the University System of Georgia pre-emptively opposing Dr. Kavianpour's appeal to USG. In his letter to USG about the suspension and termination of February 2019 and the non-renewal of January 2020, Greg Bryan wrote that "the decision of the CMO, Dr. Coule, in his sole discretion, is not reviewable or appealable," [Doc. 201-36 ECF p. 6] which is not true as described herein.

252. Dr. Kavianpour received Greg Bryan's July 20, 2020 letter [Doc. 201-36] to USG for the first time around October 2021 through discovery.

253. On June 30, 2020, Dr. Kavianpour filed a formal complaint with the ACGME about the Defendants' substantial noncompliance with the ACGME's Institutional and Program requirements and the contractual House Staff policies using substantial portions of her appeal letter to President Keel, which led to a citation for not following the contractual House Staff policies, as further described herein.

254. On August 2, 2020, Dr. Kavianpour appealed to President Keel (again pursuant to USG policy) and the University System of Georgia BOR in her Application for Discretionary Review pursuant to 6.26. [Doc. 204-27 Pl. Ex. 226].

255. On August 18, 2020, Edward Tate signed a letter on the BOR's behalf, advising that the BOR Discretionary Review Committee had affirmed the institution's decision. [BOR0042743]

256. Dr. Kavianpour received the letter from Edward Tate on about August 23, 2020.

257. On September 1, 2020, Dr. Kavianpour emailed the Office of Legal Affairs of the University System of Georgia informing them that she received the decision

letter for discretionary review and asked if there was any other appeal she should be aware of.

258. On September 2, 2020, the Office of Legal Affairs of the University System of Georgia confirmed that "Applications for discretionary review are the last recourse for students and/or employees who are aggrieved by a final institution decision by a USG president or his/her designee. There are no other appeals available once the Discretionary Review Committee has issued its decision."

259. Because she was not interested retaliatory hearings, Dr. Kavianpour's January 2020 letters offered to return the backpay and she refused direct deposit, so BOR was mailing checks to Dr. Kavianpour every month during the period of the sham process in 2020, and the last paycheck was dated August 31, 2020.

**Chief Medical Officer Dr. Coule's Suspension For A "Patient Safety Concern" Was Pretext and Erroneous When He Made a Stigmatizing Conclusion That Dr. Kavianpour Was Impaired Or Has A Substance Abuse Disorder, Without Meeting, Evaluating, Or Investigating The Provider**

260. BOR and AUMC Defendants executed a simultaneous suspension-termination, provided no investigation into the reasons for the suspension, and provided no appeal for the suspension, which prevented any name-clearing.

261. Dr. Coule issued a vague letter of suspension of clinical activities and the termination letter was issued because of the suspension mentions that the suspension was a result of an alleged violation of policy, [Doc. 192-4 ("not adhering to the Medical Center's Substance Abuse policy")] which was written by Norton, but Dr. Coule did not rely on any policy when making his decision against Dr. Kavianpour. [Doc. 177-2 Coule Dep. at 139:13–140:22, 144:17–145:16.]

262. Enterprise VP of HR Susan Norton had been making misrepresentations that the monthly testing was pursuant to a substance abuse policy or a term and condition of Dr. Kavianpour's employment when neither was true.

263. Dr. Macomson thought the monthly drug-testing protocol for Plaintiff was consistent with random drug testing policy because it "was referred to in the memo as policy" because of "the references that Susan Norton had made." [Doc. 178-1 Macomson 30(b)(6) Dep. at 91:2 – 92:2.]

264. At the March 22, 2019 hearing, Drs. Kavianpour and Macomson found out the reason for Dr. Coule's decision because both included Dr. Coule in their respective witness lists, [SMK 36 ("to discuss his investigation and decision for suspension of clinical activities"); SMK 37 ("To discuss his investigation and

decision for removal from clinical duty").] Dr. Macomson had not seen the February 21, 2019 letter Arnold sent to Dr. Coule. [Doc. 192-5.]

265. When asked about his "rationale" at the March 2019 hearing Dr. Coule said in a conclusory fashion that there was "clear and convincing evidence of concern for substance abuse …the combination of all of those events together presented a fairly clear and convincing concern for an impaired physician" [Doc. 187-9 at 155:2-17] and Dr. Coule's deposition testimony is that he "believed that Sarah Kavianpour could potentially have a substance abuse disorder." [Doc. 177-2 Coule Dep. 36:25:37:7.] The March 2019 hearing was public because minutes from the meeting could be procured via Open Records requests, and in fact were obtained by a reporter via Open Records requests.

266. Dr. Coule admits that he does not know of any performance concerns about Plaintiff that were in any way related to a substance abuse problem and he does not know of any instances where Dr. Kavianpour was written up or documented about a specific instance that she endangered a patient. [Doc. 177-2 at 55:6-15, 73:7-74:14]

267. Dr. Coule decided erroneously to regard Plaintiff as having a substance abuse disorder.

268. Dr. Coule's suspension was not based on objective evidence for a real patient safety concern, rather it was pretextual and retaliatory collusion in an orchestrated plan with AUMC's in-house counsel Cark Speese, Enterprise VP of HR Susan Norton, and AU's in-house counsel Greg Bryan.

269. If there was a real concern for an "impaired" provider, which there was not, BOR would have engaged the AU Fitness for Duty Policy because "Such policies may apply to employees and students, and may also address the provision of clinical privileges to provide care and allow for clinical privileges to be suspended or withdrawn when the fitness of a provider is in question." [Doc. 228-25]

270. Dr. Coule assumptions are not based on objective or scientific information and instead on misleading information from HR's Arnold, [Doc. 187- 5; Doc. 177-2 Coule Dep. at 63:8-21] which he did not investigate [Doc. 177-2 at 52:9-21, 139:13–140:22] like Plaintiff not presenting within four hours on the afternoon of February 13, 2019, [Doc. 192 Macomson Dep. 172:10-19] for a drug test, which was not consistent with policy that allowed up to 48 hours, [Doc. 194 Norton Dep. at 182:21-183:8, 210:18-211:20; Doc. 186 Arnold Dep. at 107:20-25] but when Plaintiff presented first thing in the morning on February 14, 2019

Debra Arnold had requested that Employee Health not test her. [Doc. 186 at 124:20-125:3; Doc. 186-21.]

271. The "Terms and Conditions of Housestaff Service to AU Health" indicates that "Within 24 hours of this [Dr. Coule's] action in denying access, AU Health will notify AU of this action and the reasons therefore. AU Health will provide all information reasonably requested by MCG relating to the denial of access and shall cooperate in AU's investigation of the denial. AU shall have the sole right to determine whether to take any disciplinary action against the student, resident." [Doc. 178-13 ¶ 9 ECF p. 4]

272. Other than making a broad conclusory statement for a "concern for patient safety," Dr. Coule withheld his "impaired physician" rationale (i.e. "the reasons therefore") for the suspension decision of clinical activities, [Doc. 177-2 Coule Dep. 61:20-62:15] which violated the "Terms and Conditions of Housestaff Service to AU Health."

273. Dr. Coule withheld the impaired physician and substance abuse disorder rationale from Dr. Kavianpour's neurosurgery supervisors, Drs. Macomson and Vale, who were better positioned to make that type of assessment, rather than Dr. Coule, who had never met Dr. Kavianpour.

274. Dr. Vale did not know the reason for Dr. Coule's suspension of Dr. Kavianpour, [Doc. 197 Vale Dep. at 145:5-12] but Dr. Coule had an affirmative duty to involve the "Clinical Chair" in the process of "management of [purported] impaired physicians." [Doc. 228-10 ECF p. 4 ¶ 5]

275. Dr. Coule never told Dr. Macomson that he viewed Dr. Kavianpour as an impaired physician or as having a substance abuse problem [Doc. 192 Macomson Dep. at 50:22-25, 51:14-17, 152:20- 25] and Dr. Macomson did not investigate Dr. Coule's reasons therefore. [Doc. 192 Macomson Dep. at 50:3-21]

276. The Neurosurgery Program Director and Chair, Drs. Macomson and Vale, do not agree with Dr. Coule's "reasons therefore" because they do not think that Dr. Kavianpour is an impaired provider or that she has a substance abuse problem [Doc. 192 at 52:10-13, 53:1-4; Doc. 197 at 44:8-18.] – she was taking care of their patients and they would not have allowed her to do so if that were the case and they testified ot that.

277. If there was a real patient safety concern, which there was not, BOR's neurosurgery faculty supervisors did not need to rely on Dr. Coule's CMO authority because the "Emergencies" section of Augusta University Policy Disciplinary Procedures for Employees Policy No. 506 allowed BOR agents to

"immediately" suspend Plaintiff if there were a "threat to any person or property," [Doc. 194-24 Pl. Ex. 194 ECF p. 20] which there was not.

278. Dr. Coule admitted he had no evidence that Dr. Kavianpour had ever been intoxicated on the job. [Doc. 177-2 at 16:13-18:6.]

279. Despite the lack of evidence, AUMC's Dr. Coule is the only one that maintains his perception that Plaintiff has a substance abuse problem or is an impaired drug addict, and despite all the negative 10+ panel screens and no signs or symptoms of impairment, he told Wesley Horne in July 2019 if they were searching for the "right substance."

280. Dr. Kavianpour's supervisor, Dr. Macomson, has never observed Dr. Kavianpour appearing in any way under the influence of any illegal substance or alcohol or anything of that nature. [Doc. 192 Macomson Dep. 53:1-10, 54:1-16]

281. Dr. Macomson did not believe that Plaintiff had a substance abuse problem. [Doc. 207-28 S. Macomson, p. 52, ll. 10-13, p. 53, ll. 1-4; Doc. 207-2 BOR SOMF ¶ 155]

282. According to BOR's statement of material facts, nobody else involved in this case considered Plaintiff to be an impaired drug addict. [Doc. 207-2 BOR SOMF ¶ 144; Doc. 207-28 S. Macomson, pp. 54, ll. 6-25 – p. 55, ll. 1-2; pp. 103, ll. 19-

25 – p. 104, ll. 1-4; Doc. 207-43 F. Vale, pp. 43, ll. 3-25 – p. 44, ll. 8-18; Doc. 207-39 S. Norton 1, p. 81, ll. 20-22; Doc. 207-8 D. Arnold, p. 31, ll. 10-12]

283. All of the drug tests were negative and Arnold expected the one on February 13-14th to also be negative. [Doc. 178-12 Pl. Ex. 150 at 263:2-264:23 (Arnold testified: "it [the Feb 13-14 test] would have been clear [negative] like all the other ones would have been. I, I didn't have a concern about patient safety.")].

284. Plaintiff tested seven times for marijuana use and passed seven tests, including a hair follicle test thereafter. [Doc. 194 Norton Dep. at 160:23-161:5; Doc. 192 Macomson Dep. 54:1-5].

285. Toxicology and occupational medicine expert, Dr. Michael Kosnett reviewed the record and determined:

> A toxicological and occupational medicine assessment of clinical data and case records does not establish that Dr. Kavianpour exhibited a consistent pattern of cognitive, physical or behavioral signs of workplace intoxication or impairment from cannabis or alcohol that resulted in an "inability to practice medicine with reasonable skill and safety.
>
> …
>
> In summary, I have systematically applied a three-part methodological approach to assess whether Dr. Sarah Kavianpour was an impaired physician that included a review of clinical data and case records and a differential diagnosis of her alleged job performance problems. I conclude that it cannot be established that she exhibited a consistent pattern of cognitive, physical, or behavioral signs of workplace intoxication or impairment from cannabis or alcohol that resulted in an inability to practice medicine with reasonable skill and safety. Dr.

> Kavianpour was not afforded the comprehensive, multi-disciplinary evaluation and management approach for impaired physicians that is a standard practice in clinical and academic medicine.

[Doc. 222-5 Dr. Kosnett (2022.02.28 ) pp. 6-9, 13-14.]

286. Dr. Kosnett also found that "[n]otwithstanding the lack of substantiation of drug-induced impairment, the punitive disciplinary action that was undertaken against Dr. Kavianpour by Dr. Coule was conducted contrary to well-established occupational health policies and practices that require a confirmatory interview and evaluation by a substance disorder professional (Berge et al, 2009)."[Doc. 222-3 Dr. Kosnett (2021.11.22) p. 5]

287. Further, the workplace drug testing expert clinician, Dr. Swotinsky's assessment is that the "record lacks evidence that Dr. Kavianpour engaged in substance abuse." [Doc. 222-7 Dr. Swotinsky (2021.12.24) p. 7]

**Other Publication Of False And Stigmatizing Information**

288. Shortly after the February 21, 2019 suspension-termination, Defendants, upon information and belief Laurel Jones or other BOR agent, publicized Dr. Kavianpour's suspension-termination and false claims about her including that she was a substance abuser, as shown by comments defendants made in March 2019 on an online blog for neurosurgery residents.

289. Defendants' agent Candice Henderson, Manager GME Operations, emailed in March 2019 Carol Dorsey in the Licensure Department of the Georgia Composite Medical Board and stated that Dr. Kavianpour had been terminated for "professionalism issues."

290. Laurel Jones, residency program coordinator, on June 26, 2019, emailed the American Board of Neurological Surgery and stated that Dr. Kavianpour had been terminated "for failure to comply with the University's HR division, and their policy on substance abuse screening."

291. Without executing a medical release, Dr. Savage, in her response to ACGME, told them in August 2021 that Dr. Kavianpour had tested positive for amphetamines without the context that it was due to a legal prescription for her medical condition so the test was verified negative.

292. On August 22, 2018, Debra Arnold, Susan Norton, Greg Bryan, Clark Speese or other Defendants or their employees stated in a meeting that Dr. Kavianpour was a chronic marijuana smoker who could not function without it, as reflected in BOR HR notes for the meeting and, upon information and belief, were available to the public by an open records request.

**The Substantive Bases For All Adverse Actions (Suspension, Termination, and Non-renewal) Were Erroneous Because the Monthly Testing Was Not Pursuant to Policies or A Term And Condition of Dr. Kavianpou's Residency Or Employment So Dr. Kavianpour Did Not Violate Any Substance Abuse Policy Or A Term And Condition Of Her Contract**

**Pre-employment**

293. Since 2013, Susan Norton was informed that she was supposed to "conduct a thorough review of their urine specimen collection and chain of custody process as they are applied specifically to the drug screening for incoming residents to ensure they are <u>flawless and will stand up to even the the [sic] most rigorous scrutiny."</u> [Doc. 201-9 Pl. Ex. 14 p. 3(emphasis added)].

294. In late June 2018, Plaintiff made a request for reconfirmation of an initial positive finding of a pre-employment drug test that Defendants could not fulfill without a recollection because they do not do split specimen collections as required by Georgia law, so she made written requests for "cancellation" and recollections. [Doc. 189-7 Pl. July 3, 2018 letter; Doc. 189-9 Pl. July 5, 2018 letter].

295. In responding to Dr. Kavianpour's pre-employment appeal in July 2018, Dr. James Foster, the Medical Review Officer, explained to Susan Norton that if and when Dr. Kavianpour is provided a second test it would "clear her" when it is negative, [Doc. 188 James Foster 30(b)(6) Dep. at 72:9–73:2; Doc. 188-7 ECF p.

64 (BOR0035338)] and Dr. Moore specifically involved Greg Bryan in early July 2018 in Dr. Kavianpour's appeal to make sure regulations were being followed, but Greg Bryan admits in his deposition that he "wasn't aware that the State had the [sic: drug] testing regulations." [Doc. 201 Bryan Dep. at 57:13-21]

296. Dr. Foster, the BOR 30(b)(6) witness, admitted that they were following the laws that he said applied and recognized that if split specimen collections are required, the initial test was canceled, which is not a positive or a negative, it is "nonexistent" because "there is no opportunity for reconfirmation." [Doc. 188 Foster 30(b)(6) Dep. at 56:18-25, 59:1-11, 64:7-16, 65:12-19]

297. The negative second pre-employment test or recollection cleared Dr. Kavianpour and led to her hiring [Doc. 194 Norton Dep. at 224:13-15] with a standard residency contract.

298. Workplace drug testing expert clinician and author of MRO handbooks, Dr. Swotinsky found that Dr. Kavianpour's June 25, 2018, urine drug test was a canceled test under the AU/AUMC policy. The policy incorporates procedures of the HHS *Mandatory Guidelines* that require split specimen collections. The test is canceled and the employee is retested, but that canceled test is not a basis for disciplinary action. [Doc. 222-4 Dr. Swotinsky (2021.12.24) pp. 3, 9.]

299. Plaintiff did not execute a medical release to authorize disclosure or discussion of confidential medical information of the canceled first drug test of 6/25/19 and the original authorization to release or disclose the initial test finding expired on July 1, 2018, [Doc. 229-3 Kavianpour 08/05/22 Decl.¶¶ 5-6; Doc. 228-2 AUMC 946] and it was not placed in her personnel file. [Doc. 197-8 Pl. Ex. 25 SMK 859-907 authenticated Kavianpour personnel file from HR]

**Post-employment and the Misuse of Random Drug Testing Policies and Law for Selective Monthly Testing That Does Not Adhere to Any Contractual Policy**

300. "[BOR] Defendant admits Dr. Kavianpour's contract of employment did not specify whether Plaintiff could be required to submit to "random drug tests" except in accordance with the policies and procedures incorporated or referenced therein." [Doc. 208-2 BOR Def. Resp. to Pl. RFA p. 8-9 ¶11].

301. On August 21, 2018, Plaintiff was issued a memo from Susan Norton, VP of HR of AU and AUMC, creating an ad hoc protocol to test Dr. Kavianpour every month that was purportedly in "in accordance" with random drug testing policy and Georgia law for random drug testing of high-risk employees. [Doc. 194-1 (memo); Doc. 178-1 Macomson 30(b)(6) Dep. 160:8-14].

302. The only notice that Dr. Kavianpour received in the August 21, 2018 memo [Doc. 192-1] was that a positive finding would result in termination.

303. The August 21, 2018 memo was not a contract nor a written agreement. [Doc. 186 Arnold Dep. 33:12-15; Doc. 194 Norton Feb. Dep. 267:23–268:2.].

304. VP of HR Susan Norton admitted in her deposition that there were "mistakes" made relative to Plaintiff "both in terms of what constitutes random testing under the policy and also in terms of the 48-hour window for her to be tested." [Doc. 194 Norton Dep. at 210:18-211:20].

305. Dr. Macomson testified that "we [Neurosurgery Department] had been informed that drug testing would be part of her employment, from HR. The [sic] we were informed that it would be a requirement, but we did not implement or we did not formulate that requirement." [Doc. 178-1 Macomson 30(b)(6) Dep. at 156:2-7.]

306. Neither neurosurgery purported decision-maker Dr. Macomson nor Dr. Vale read or independently investigate whether policies were followed and relied on HR. [Doc. 178-1 Macomson 30(b)(6) Dep. 92:10–94:8 ("I don't believe that there is a requirement to independently interpret policies."); Doc. 197 Vale Dep 84:18-85:8 (he had an "understanding that they [HR] knew what they were doing")].

307. All recommendations and decisions were based on the misrepresentation that the monthly testing of Plaintiff was consistent with substance abuse policy when it was not – the February 21, 2019 suspension-termination, [Doc. 192-4 ("not

adhering to the Medical Center's Substance Abuse policy")] the March 2019 HR hearing panel, [Doc. 187-7 Pl. Ex. 8 ("[n]egative results from the subsequent random tests are inconsequential as this was an ongoing program initiated as a condition of hire")] the CCC in January 2020, [Doc. 192-15 Pl. Ex. 55 ECF p. 1 ("violations of hospital and university policies and procedures include -1 failure to comply with mandatory drug testing")] and the Ad Hoc committee of 2020. [BOR0042732-4 ("3. Violations of Policies and Procedures a. Failure to comply with mandatory drug testing")]

308. As BOR's 30(b)(6) witness, Dr. Macomson admitted that the August 21, 2018 memo [Doc. 194-1] does not indicate any discussion that Dr. Kavianpour would only be a resident if she took monthly drug tests. [Doc. 178-1 Macomson 30(b)(6) Dep. 159:18 –160:6.]

309. The "main substance" of the August 21, 2018 memo is that it was random testing pursuant to the policy. [*Id*. 160:8-14.]

310. Dr. Macomson never spoke to Dr. Kavianpour about the random drug testing. [Doc. 192 Macomson Dep. 153:1-4].

311. As the BOR 30(b)(6) witness, Dr. Macomson testified that the August 21, 2018 and January 31, 2019 memos are not a contract or policy, Dr. Kavianpour's contract does not require month-to-month drug testing, and the form of drug

testing to which she was subjected was not a term and condition of Dr. Kavianpour's employment. [Doc. 178-1 Macomson 30(b)(6) Dep. 46:14-17, 55:11-25; 75:20-22, 46:18-24, 47:9-48:2, 49:16-19, 48:15-19, 53:24–54:3, 67:23–68:1.]

312. The USG Director of Compliance, Mr. Wesley Horne, and AU and AUMC's VP of Compliance, Mr. Clay Sprouse, testified that the monthly drug testing of Dr. Kavianpour was not pursuant to any policy. [Doc. 203 Horne Dep. at 289:13-22, 87:20-23; Doc. 205 Sprouse Dep. at 77:17-19, 153:5-8, 190:20-191:18].

313. On February 21, 2019, Plaintiff was suspended and terminated for allegedly "not adhering" to the "Medical Center's Substance Abuse policy" [Doc. 197-4] – the policy that Plaintiff was cited for allegedly violating required that the employee selection be "anonymous," but the monthly testing of Plaintiff was "selective," and according to the Neurosurgery Chair, Dr. Vale, Human Resources Norton and Arnold's violations of that policy "was not a factor" in the decision-making against Dr. Kavianpour. [Doc. 197 Vale Dep. at 32:1-33:5, 47:6-18, 70:20-22, 83:7-22, 124:9-126:2]

314. Dr. Vale testified that for the 2020 CCC process Dr. Kavianpour's objections (about the misapplication of policy that violated the law and her legal rights) was a factor in upholding the termination. [*Id*. 199:19-200:18]

**A New ACGME Citation Was Issued to the Sponsoring Institution For The Substantial Non-compliance with ACGME Requirements Because of Information Defendants Provided in Response to Dr. Kavianpour's Complaint**

315. Substantial non-compliance with ACGME requirements can lead to the loss of accreditation[1] and the corresponding federal GME funds.

316. In response to the formal complaint filed to ACGME by Dr. Kavianpour, ACGME sent a letter dated November 11, 2020, to Dr. Michael Hocker, the Designated Institutional Official ("DIO") at the time, requesting that the institution "respond to the allegations set forth below and include any documentation that would demonstrate compliance with the requirements" and stated the following:

> **It is alleged that the institutional GME policy for promotion and renewal of resident appointments was violated when Dr. Kavianpour**

---

[1] "I.A.2. The Sponsoring Institution must be in substantial compliance with the ACGME Institutional Requirements and must ensure that each of its ACGME-accredited programs is in substantial compliance with the ACGME Institutional, Common, specialty-/subspecialty-specific Program, and Recognition Requirements, as well as with ACGME Policies and Procedures. (Outcome)
I.A.3. The Sponsoring Institution must maintain its ACGME institutional accreditation. Failure to do so will result in loss of accreditation for its ACGME-accredited program(s). (Outcome)" See ACGME Institutional Requirements https://www.acgme.org/globalassets/pfassets/programrequirements/800_institutionalrequirements_2022.pdf [p. 2 of 18].

> **received late notice of nonrenewal of her appointment. It is further alleged that Dr. Kavianpour did not receive due process under institutional GME policy for actions of suspension, nonrenewal, and dismissal.**

[Doc. 196-2 Pl. Ex. 342, B0R0040851(bold original).]

317. On December 2, 2020, Dr. Hocker provided a response letter to ACGME, alleging that they followed AU HS Policy 18.0 and 13.0, and provided the following supporting documents:

ACGME Complaint PD-DIO Allegation Letter Medical College of Georgia.pdf

ACGME Response Letter MCG 12.2.2020.pdf

Attachment #1 17.0 promotion policy.pdf

Attachment #2 18.0 house officer performance.pdf

Attachment #3 Neurosurgery CCC Recommendation.pdf

Attachment #4 13house officer evaluation grievance and due process.pdf

Attachment #5 Ad Hoc Recommendation KavianpourFinal.docx

Attachment #6 S. Kavianpour 5.5.2020_Dean Response.pdf

Attachment #7 Keel decision letter.pdf

Attachment #8 LT Tate 07202020.pdf

Attachment #9 Kavianpour Decision BOR.pdf

[Doc 196-1 PFF Ex. 340, BOR 40802-6], which covers the time period of the CCC/Ad Hoc process of 2020.

318. On August 4, 2021, ACGME sent a letter to MCG indicating that the Institutional Review Committee determined that there appears to be validity to Dr. Kavianpour's complaint and requested additional clarifying information from the DIO, currently Dr. Natasha Savage, which Dr. Savage sent to ACGME on August 13, 2021. [Doc. 171-1 Pl. Ex. 394 August 4, 2021, ACGME letter; Doc. 171-6 Pl. Ex. 379 Savage Clarifying Information for ACGME.]

319. On December 3, 2021, ACGME sent a letter noting that based on the information Defendants provided the Institutional Review Committee, Defendants were in substantial non-compliance with ACGME requirements and "institutional GME policies and procedures," corresponding to AU House Staff policies 18.0 and 13.0, for Dr. Kavianpour's "remediation" and "nonrenewal," so new citations were issued to the Designated Institutional Official, Dr. Natasha Savage:

> **NEW CITATIONS**
>
> **DIO I Since: 09/28/2021 I Status: New**
>
> Structure for Educational Oversight, Sponsoring Institution, Designated Institutional Official (Institutional Requirements I.A.5, I.A.5.a))

The Sponsoring Institution must identify a Designated Institutional Official (DIO): This individual, in collaboration with a Graduate Medical Education Committee (GMEC), must have authority and responsibility for the oversight and administration of each of the Sponsoring Institution's ACGME-accredited programs, as well as for ensuring compliance with the ACGME Institutional, Common, specialty-/subspecialty-specific Program, and Recognition Requirements. (Core) The information provided to the IRC does not demonstrate substantial compliance with the requirements. It is not apparent that the Sponsoring Institution's Designated Institutional Official ("DIO"), in collaboration with the GMEC, ensures compliance with ACGME requirements. Information submitted in response to the complaint, and in subsequent clarifying information, does not document substantial monitoring of compliance with institutional GME policies and procedures. The information submitted does not document institutional assurance that Dr. Sarah Kavianpour received a timely written notice of intent when it was determined that Dr. Kavianpour's appointment to the Neurological Surgery residency program was not to be renewed. Information concerning the remediation provided to Dr. Kavianpour does not

> <u>substantially document compliance with the Sponsoring Institution's policy addressing the nonrenewal of resident appointments.</u>

[Doc. 171-2, BOR 66744-5.(emphasis added)].

320. Defendants received the ACGME citation partly because MCG's Designated Institutional Official must have ultimate authority over a learner's residency, not the CMO, Dr. Coule.

321. The Sponsoring and Participating Institutions must abide by the AU GME HS policies and ACGME requirements, and the DIO must oversee compliance. [Doc. 171-2, BOR0066744-5].

322. The Sponsoring Institution's Designated Institutional Official DIO and the Neurosurgery Residency Program have a duty to comply with ACGME requirements, including bringing areas of non-compliance for which they received citations into compliance. [Doc. 178-1 Macomson 30(b)(6) Dep. 126:1–127:9, 128:3–129:2, 132:20-24].

323. Defendants have not remedied the substantial noncompliance with ACGME requirements referenced in the December 3, 2021 ACGME letter because they have not reinstated Dr. Kavianpour to provide her with remediation if there were any alleged performance issues.

324. In June 2022, Dr. Savage testified that she was not going to take corrective actions relative to Dr. Kavianpour.

**COUNT I - ADA and Rehabilitation Act Retaliation: 2020 Second Termination**

325. BOR and AUMC violated Titles I, II, and III of the ADA and the Rehabilitation Act when they took adverse actions against Dr. Kavianpour, including terminating her for a second time in 2020, because of her protected activity under the ADA, Titles I, II, and III, and under the Rehabilitation Act.

**EEOC**

326. On February 15, 2021 Dr. Kavianpour filed a (second) charge with the EEOC against AUMC and BOR alleging ADA retaliation in connection with her second termination.

327. On February 24, 2021 the EEOC confirmed receipt.

328. Upon information and belief, the EEOC has not issued a right to sue letter for this charge.

329. Dr. Kavianpour has requested her charge number for the purpose of requesting a right to sue letter and by checking her mail frequently.

330. Dr. Kavianpour requested her right to sue letter on August 22, 2022, and she will seek leave to amend to include in the complaint receipt of any forthcoming right to sue letter.

**Adverse Actions**

331. After BOR allegedly "reinstated" Dr. Kavianpour in December 2019, Dr. Kaviainpour was terminated for a second time.

332. The sham "reinstatement" of December 2019, had some of the immaterial aspects of an ACGME contract, which they used to create the appearance of reinstatement to have a hearing in January 2020, which would not provide Dr. Kavianpour any meaningful notice of the basis for the charges to be alleged then, where the hearing was held to reach a pre-ordained outcome of termination, whereby once against Kavianpour was precluded from real reinstatement or access to clinical activities and material participation in a residency program.

333. The sham reinstatement, and sham hearing, created an adverse action that was sufficiently severe and adverse to deter a reasonable person from opposing unlawful activity.

334. Additionally or alternatively Defendants decided not to (re)hire Dr. Kaviapour which is an adverse action under the ADA and Rehabilitation act.

335. Dr. Kavianpour received a letter, dated August 18, 2020, and marked as sent on the 19th, from Edward Tate on behalf of BOR, notifying her that BOR had affirmed the institution's recommendation and that termination was the "final" decision.

336. Dr. Kavianpour received the letter from Edward Tate no sooner than August 23, 2020.

337. Other adverse actions include that Dr. Kavianpour was deprived of material terms and conditions of her employment when Defendants forced her to go through stigmatizing, biased, and futile appeal or review process in 2019 and 2020, and the refusal of DIO Savage to rehire Dr. Kavianpour and correct the violations identified in the ACGME citation, in order to attempt to cover up their retaliation against Dr. Kavianpour, which would deter a reasonable person from opposing unlawful activity especially when considered cumulatively.

338. Plaintiff brings this claim challenging both discrete adverse actions, such as the alleged non-renewal, and a continuous policy, practice, or retaliatory hostile environment that includes the other adverse actions.

**Protected Activity**

339. Before this second termination, Dr. Kavianpour engaged in protected activity by opposing conduct she reasonably and in good faith believed was unlawful

under the ADA and Rehabilitation Act, including when she: (1) repeatedly complained in 2018 and in early 2019 that the drug testing imposed on her was unlawful; (2) opposed the narrow time window for drug testing and lack of accommodation for her patient safety, on-call pager duty, by attending to her patient safety duties even though this caused her to miss the window for drug testing; (3) correspondence before and during the March 2019 hearing; (4) filed a complaint of retaliation and unlawful drug testing and participated in BOR Compliance Officer John Lott's investigation into her complaints, (5) on July 30, 2019, Plaintiff filed a charge against AU and AUMC with the EEOC including allegations of ADA violations; (6) filed a lawsuit, case no. 1:20-cv-00152, on December 12, 2019, including several ADA and Rehabilitation Act claims against Defendants.

**Causal Connection, i.e. Retaliatory Motive**

340. The second termination or failure to rehire was caused by and in response to Dr. Kavianpour's protected activity.

341. The decisionmaker(s) for the second termination, namely Chris Melcher, Susan Norton and others, were aware of her protected activity.

342. The decisionmaker(s) for the second termination had retaliatory motive as shown by close temporal proximity.

343. The proffered reason for the second termination was knowingly false as shown above and pretextual because intentional denials of process occurred and the legal department and others kept Dr. Vale and Dr. Macomson in the dark with the false impression that they could not overturn Dr. Coule's suspension decision, and there was a pre-ordained decision.

344. BOR's retaliatory motive is also shown by their retaliatory termination of John Lott, BOR's Compliance Officer who investigated Dr. Kavianpour's complaints of unlawful drug testing and was immediately terminated upon issuing a report to Defendant President Keel that found that Dr. Kavianpour had been subjected to unlawful drug testing and retaliation. [*See* above paragraphs 110-111, 183].

345. BOR is liable for the second termination because BOR employees were the formal decision makers for the second termination.

**AUMC's Liability**

346. AUMC is also liable for the second termination because (1) the alleged basis for the second termination was the suspension of hospital access by Dr. Coule as CMO for AUMC and upon information and belief Dr. Coule refused to reconsider the suspension even though he admitted in deposition it was supposed to be temporary (2) Dr. Coule participated in the meeting in March 14, 2019 and

December 11, 2019 about how to proceed with Dr. Kavianpour's appeal or grievance process and Dr. Coule told Wesley Horne that she could appeal his decision through the GME process and Horne told him of the need to clarify the process going forward, and at the December 11, 2019, meeting USG tells them they have to have process for appeal of the suspension, even though Dr. Coule is a BOR employee.

347. GME is a hybrid department with authority over credentials and privileges for residents at AUMC so that includes AUMC, i.e. GME is an agent of AUMC as well.

348. Liability extends under the ADA's anti-retaliation provision and case law prohibiting interference with employment opportunities, which protects any "individual" as opposed to any employee, 42 U.S.C. § 12203(a)-(b) and the Rehabilitation Act's retaliation and interference provision to AUMC's actions against Dr. Kavianpour because AUMC was Dr. Kavianpour's employer and a party to her employment contract, and alternatively because (1) AUMC was "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's [i.e. BOR's] qualified applicant or employee with a disability [i.e. Dr. Kavianpour] to the discrimination prohibited by this subchapter; 42 U.S.C. § 12112(b)(2), (2) AUMC was an indirect or joint

employer of Dr. Kavianpour, as shown by AUMC's control over Plaintiff's work place, imposition of its policies including its drug testing policies on residents, BOR's testimony that "AUMC is part of or is under thumbrella of the Medical College of Georgia" and "they're the same" for the administration and operation of the graduate medical education residency program, reimbursement for salaries and other employee costs, and AUMC's control and causal role in the challenged suspensions and terminations of Dr. Kavianpour.

**This Count Is Brought Within The Statute Of Limitations**

349. The ADA claim is timely because the statute of limitation does not start until Dr. Kavianpour receives her right-to-sue letter from the EEOC.

350. Both the ADA and Rehabilitation Act claims are timely because Dr. Kavianpour received the "final" decision to terminate her or refuse to rehire her no sooner than August 23, 2020.

351. The challenged retaliation was a continuous policy, practice, and hostile environment, that continued through at least the August 23, 2020, second termination and also the continued failure to rehire from then through 2022.

**Count II 14th Am. Procedural Due Process**
**The So-Called "Suspension" Of Hospital Access**

352. Dr. Kavianpour brings this claim under section 1983, *ex parte Young*, and the Fourteenth Amendment's due process clause to challenge the sham and complete lack of process for the February 21, 2019 "suspension" of hospital access and the simultaneous termination from residency, without evidence of performance problems or justification for taking of hospital access. By design and in effect this initial suspension has become a permanent, unreviewable, or repeatedly reaffirmed removal of hospital access through the inadequate and sham process and hearings in 2019, 2020. Further proof of this is the revelation by Dr. Savage's deposition in March 2022 that the ACGME Designated Institutional Official refuses to correct the ACGME citation and comply with the ACGME duty to enforce an adequate remediation process.

353. Count III below is specific to the procedural due process claim challenging the second termination.

354. Dr. Kavianpour brings this claim against the following Defendants.

355. Dr. Coule in his individual capacity for monetary damages and in his dual official capacity as a policymaker as the Chief Medical Officer for both AUMC and AU (BOR), with monetary and injunctive relief sought in the official capacity

for AUMC, and for injunctive relief sought in his official capacity for AU and BOR.

356. AUMC, for monetary damages as an entity acting jointly or under color of state law, though not as the State, and not protected by 11th Amendment immunity, and for injunctive relief.

357. Clark Speese in his individual capacity for monetary damages and his official capacity for AUMC for monetary and injunctive relief.

358. Susan Norton in her individual capacity for monetary damages.

359. Debra Arnold in her individual capacity for monetary damages.

360. Greg Bryan in his individual capacity for monetary damages.

361. Dr. Natasha Savage, Designated Institution Official, for official capacity for injunctive relief.

362. Dr. Samuel Dion Macomson, as Program Director for the Neurosurgery Program, in his official capacity for injunctive relief only.

363. Dr. Hess, Dean of the Medical College and signatory of the Medical College of Georgia's contract with Dr. Kavianpour, in his official capacity for injunctive relief only.

364. Dr. Brooks Keel, AU president and CEO of AU Health System which is the parent institution of AUMC, in his official capacities for injunctive relief only.

## Under Color Of Law And State Action

365. The actions of AUMC, Dr. Coule as CMO, and Clark Speese were under color of state law and constituted state action for purposes of Count II as described in what follows.

366. Dr. Coule as CMO of AUMC for BOR, was an employee and agent working for BOR when he suspended Dr. Kavianpour, as shown above in paragraph nos. 9, 21-23, 45, 274, discussing Dr. Coule's job description stating that he must work in conjunction with BOR in managing resident and faculty physicians, alleged to be impaired.

367. Defendants Dr. Coule, and Clark Speese, and thereby AUMC conspired, i.e. agreed upon a "plan" with Debra Arnold, Susan, Norton, and Greg Bryan to suspend Dr. Kavianpour for the purpose of forcing her termination, by falsely claiming that the suspension of hospital access was permanent or unreviewable, which thereby denied her any meaningful process to prevent or correct the suspension-termination, as shown above in paragraphs 69-120.

368. They kept Dr. Coule's "impaired" rationale a secret from the department supervisor physicians who would have disagreed, as shown above in paragraphs 260-284.

369. Part of the coordinated plan to suspend and terminate Dr. Kavianpour, included Defendant Clark Speese asking for and receiving from BOR's Defendant Greg Bryan and attorney Chris Melcher, input and approval on the draft of Dr. Coule's suspension letter.

370. AUMC, although nominally a private corporation that manages the teaching hospital serves the express purpose of furthering the educational purpose of the Medical College, and unless acting ultra vires, is comprised of a state entity, namely AU and BOR, as shown in paragraphs 6, 25-31, 41-56.

**Liability of Each Defendant**

371. Entity liability or *Monell* requirements are satisfied[2] for Defendants AUMC and the official capacity claims brought in Count II, as addressed immediately below, for the retrospective damages claims and then for the prospective injunctive relief claim.

372. Dr. Coule was a final policy maker for both AUMC and BOR when he simultaneously suspended her access to clinical activities in the teaching hospital

---

[2] These statements are in the alternative on the assumption that *Monell*'s requirements apply to a private company acting under color of law such as AUMC, or to an official capacity claim for injunctive relief against an employee or agent of the state, which Plaintiff does not concede.

acting jointly and in collaboration with others on February 21, 2019 (See paragraphs above 9, 21-23, 29, 32-34, 41-53, 71-87).

373. Dr. Coule, Susan Norton, and Debra Arnold in conjunction with the in house approval and advice of Defendants Clark Spees, AUMC legal counsel and Greg Bryan, AU legal counsel, which was used to cause the challenged, simultaneous suspension of access to clinical activities at the hospital, and then without investigation of any due process, the termination of the residency of Dr. Kavianpour, the denial of due process in March 2019.

374. Clark Speese, in his official capacity, was a final policy maker for AUMC on the suspension, because as the Legal Counsel he was the highest ranking person for AUMC in causing the suspension and termination, and had the authority to correct and reverse the suspension and termination.

375. AUMC and BOR had a policy or custom that denied any review of the suspension of clinical access under Dr. Coule's authority, which was ongoing through at least August, 23, 2020, because they acted on an assertion that the suspension was unreviewable and could not be overturned, by BOR including Dr. Vale, the neurosurgery Department Chair, or Dr. Macomson, the Neurosurgery Department, ACGME Program Director.

376. It was obvious to AUMC, BOR, and the official capacity defendants, that they needed to supervise or train their employees or subordinates on requirements to provide a process and hearing whereby a resident who was suspended and terminated would have an opportunity to contest the suspension and not merely the termination.

377. AUMC, BOR, and the defendants sued in their official capacities were deliberately indifferent in their failure to supervise or train their employees or subordinates with respect to their suspending and terminating Dr. Kavianpour and failing to provide adequate process to Dr. Kavianpour; and, that deliberate indifference caused the challenged denial of due process.

378. For purposes of injunctive prospective relief against AUMC and the official capacity defendants, Dr. Coule, Clark Speese, Dr. Savage, Hess, and Keel, President of AU and CEO of AU Health Systems, that includes AUMC, *Monell*'s requirements are satisfied because these Defendants were official policy makers with the ability to stop, reverse and or reinstate Dr. Kavianpour, and their current and ongoing deliberate decision not to reinstate Dr. Kavianpour going forward, despite abundant notice, including from this lawsuit and the ACGME citation, show lack of adequate process for Dr. Kavianpour, establishes *Monell* liability for prospective relief.

379. **Dr. Coule** – CMO for AUMC and BOR suspended Dr. Kavianpour's hospital access and continually refused to reinstate her hospital access from February 21, 2019, through the present, or in other words adopted a (false and misleading) policy that the suspension was permanent, so that the appeal and hearing process from 2019 through 2020 would be a sham and meaningless because the suspension, and the termination that was based on it would not be overturned as described above in paragraphs 69-120.

380. Dr. Coule was a decisionmaker for the February 21, 2019 termination and was "on board" with the plan to suspend Dr. Kavianpour in order to force her termination and prevent any meaningful review of the termination because the termination was premised on the unreviewable permanent denial of hospital access.

381. Before the March 2019 hearing, Dr. Coule never told Dr. Kavianpour that there was any way for her to appeal the suspension or seek reinstatement of her hospital access, even though Dr. Coule received Dr. Kavianpour's complaints and request that she be able to contest the suspension at the hearing, but Dr. Coule failed to respond and in coordination with other Defendants did not allow her to contest the suspension at the March 2019 hearing. [*See* above paragraph nos. 91, 101-108 & 114.]

382. Dr. Coule participated in the March 14, 2019, meeting among Defendants and the decision to deny Dr. Kavianpour adequate process to review the suspension or termination, and to not inform her that GME could reinstate hospital access.

383. Right before the March 2019 hearing, Dr. Coule announced that the hearing was a waste of time and a waste of money because it was a done deal, and the result of the March 2019 hearing, as well as the January 2020 hearing and the May 2020 Ad Hoc Committee and Edward Tate's final decision on behalf of BOR in August 2020, was an affirmance of the termination because Dr. Coule's denial of hospital access was allegedly permanent or unreviewable. *See* above paragraph no. 251 (showing the final August 2020 decision was based on the suspension being allegedly unreviewable).

384. Dr. Coule participated in the March 2019 hearing as a witness or accuser and made false and inappropriate accusations against Dr. Kavianpour, including that she was a substance abuser and that had engaged in subversive behavior by overhydrating to cover and avoid a positive urine drug tests, of which he had not provided her notice. [*See* paragraph above no. 131.]

385. Dr. Coule participated in the November 2019 meeting about Dr. Kavianpour called by USG officials who informed them they needed to reinstate Dr.

Kavianpour because they had failed to provide the correct process to her. *See* paragraphs above nos. 38-40, 187, 191, 193.

386. Dr. Coule admitted that he knew that the suspension was supposed to be temporary and that it was supposed to be reviewed by BOR who had the authority to overturn it and was instructed by Compliance Officer Wesley Horne in November 2019 to provide a process to review the suspension.

387. **Clark Speese** – was part of the "plan" to suspend Dr. Kavianpour in order to force her termination and prevent meaningful review thereof, and he communicated with Dr. Coule to get him "on board" with the plan and wrote or helped write the notice of suspension from Dr. Coule.

388. Speese sent a draft of the suspension notice to BOR attorneys Greg Bryan and Chris Melcher and asked for and received input and approval.

389. Speese sent the final, signed version of the suspension notice to BOR to be used in "conjunction" with her termination.

390. Speese received the early March, 2019, requests or complaints from Dr. Kavianpour about her right to an adequate process to review the suspension and the termination.

391. Speese participated in the March 14, 2019, meeting among Defendants and decision to deny Dr. Kavianpour adequate process to review the suspension or termination, and not inform her that GME could reinstate hospital access.

392. In June 2019 Clark Speese was called by Compliance Officer John Lott who told him of the violations of policy and process with respect to Dr. Kavianpour, and Clark Speese admitted they screwed up, but, nonetheless, could have but did not take any action to provide Dr. Kavianpour adequate process for the suspension and termination.

393. **Susan Norton** – Enterprise VP of HR, Norton was part of a plan to suspend and terminate Dr. Kavianpour. Originally Norton made false representations that the monthly drug testing imposed on Dr. Kavianpour's were pursuant to a substance abuse policy or a term and condition of Dr. Kavianpour's employment. With Arnold, Norton wrote the January 31, 2019 Memorandum/email that imposed stringent drug testing requirements on Dr. Kavianpour. Norton assisted in writing Dr. Kavianpour's February 21, 2019 termination letter. In the termination letter, Norton specifically attempted to limit the appeals process Dr. Kavianpour had available to her, indicating, for example, that Dr. Kavianpour could file a grievance with HR but not informing Dr. Kavianpour of the contractual grievance with GME. Later, Norton wrote the statements and

questions and selected the witnesses for Dr. Kavianpour's March 2019 grievance hearing.

394. Norton would later admit that she knew in advance that Dr. Kavianpour would be suspended without an ability to remediate and that the suspension would necessarily lead to her termination; in other words, there was a "coordination of [Dr. Kavianpour's] suspension and her termination, that was occurring all at the same time."

395. **Debra Arnold** – Arnold was part of a plan to suspend and terminate Dr. Kavianpour. In her January 31, 2019 email/Memorandum to Dr. Kavianpour, Arnold subjected her to stringent requirements for drug testing, including drug testing within a four-hour window. Arnold failed to follow her own January 31, 2019 memorandum and ensure Dr. Kavianpour's clinical activities did not interfere with the drug testing. After Dr. Kavianpour failed to present for drug testing on February 13, 2019, but instead presented for testing on February 14, 2019, Arnold denied her ability to test and sought to suspend and terminate Dr. Kavianpour. Arnold wrote a February 21, 2019 memorandum regarding Dr. Kavianpour that Dr. Coule relied upon when deciding to terminate Dr. Kavianpour, and Arnold collaborated in drafting the February 21, 2019 termination letter.

396. After Dr. Kavianpour was terminated, Arnold misrepresented the appeals process. On March 1, 2019, Arnold decided, with others, that Dr. Kavianpour was "ineligible for rehire" at AU and AUMC. In a March 12, 2019 email Arnold incorrectly wrote that "[t]he clinical suspension is not something [Dr. Kavianpour] can appeal through the AU policy" and this was passed on to Dr. Kavianpour.

397. **Greg Bryan** – Defendant Greg Bryan is counsel for AU. With other BOR employees, he agreed on a "plan" to suspend Dr. Kavianpour. Bryan advised HR's Norton and Arnold when drafting the January 31, 2019 memorandum imposing stringent drug testing requirements on Dr. Kavianpour, stated on February 11, 2019, that he "can already sense that we are headed for a rough time with this resident," advocated for suspending or terminating Dr. Kavianpour after a purported failure to present for the February 13, 2019 drug test, and reviewed Dr. Coule's suspension letter before it was issued to Dr. Kavianpour.

398. After Dr. Kavianpour was terminated, Bryan, as legal counsel, decided on March 1, 2019, with other BOR agents, that Dr. Kavianpour was "ineligible for rehire" at AU and AUMC before Dr. Kavianpour ever appealed her termination in late March 2019, let alone the purported December 2019 reinstatement.

Finally, Bryan continued to misrepresent that Dr. Coule's decision to suspend Dr. Kavianpour was non-reviewable or could not be appealed.

**Protected Property Interest**

399. Dr. Kavianpour's 2018-2019 employment contract was with both BOR and AUMC. [*See* paragraphs below no. 477-486.]

400. As reflected in HS 13 and 18 there are elaborate process, notice, and hearing requirements for the learning future of medical specialists, before any adverse action can be taken which show that there was a mutual understanding that she had "for cause" protection from adverse action (even though the words "for cause" are not used).

401. The contract and the incorporated and applicable House Staff policies show that AUMC and BOR needed good cause before they could take "disciplinary action" and "any other actions that could significantly threaten a House Officers . . . career development," including "probation … and/or suspension or dismissal" before they could take away access to clinical training. [*See* below paragraph nos. 486-490 (discussing HS 13.0 and 18.0).]

402. The February 21, 2019, so-called "suspension" of hospital access falls within the class of adverse actions for which Dr. Kavianpour had for-cause protection, because it was a "suspension," and because Defendants promptly reported the

suspension to various medical boards and otherwise publicized the suspension and its alleged basis, that Dr. Kavainpour was a substance abuser, which drastically threatens her "career development." *See* paragraphs 260-292.

403. Plaintiff is a medical resident in a federally funded residency training program in which she is to be trained by the medical faculty of the Sponsoring Institution, and is a designated and intended third party beneficiary of the grant from the federal government to the Sponsoring Institution to train her, in a manner that is consistent with the lawfully applied processes of HS 13 and 18, that provide meaningful notice and opportunity to correct purported performance problems.

404. For cause protection for adverse action is also shown by the rigorous procedural protections provided on paper by HS 13 and 18 the steps outlined up through the notice of three months. [*See* below paragraph nos. 486-490].

405. Program Director, Dr. Macomson, and Department Chair, Dr. Vale, HR's Norton and Arnold admit that there were no performance problems, and none had been brought up or addressed pursuant to the required process before the challenged suspension-termination on February 21, 2019, without investigation, under the false premise, created without due process, that the testing was a term and condition of Dr. Kavinapour's residency contract and that she had to present

for the testing, under the policy labeled as random, in four hours, when she had 48 hours, even if the testing had been lawful random testing.

406. Dr. Coule admitted that he had no evidence of performance problems and that he had conducted no investigation.

407. Because there was no evidence of performance problems, Dr. Kavianopour, and a legitimately functioning residency program had a mutual expectation that she would continue to have access to the hospital for clinical training, because there had been no process implemented to prove otherwise.

408. Under the Terms and Conditions, the contract, which was fraudulently withheld by Defendants until it was provided in discovery by AUMC in October 2021, provided that access of a resident under the federal residency grant could not be denied except upon a for cause showing. [*See* below paragraph nos. 486-490 (discussing HS 13.0 and 18.0).]

409. State law, O.C.G.A. § 45-23-8, requires these Defendants to follow state and Constitutional law in any implementation of drug testing or disciplinary consequence thereof showing that adverse action could not be taken against Dr. Kavianpour on the grounds of alleged violations of drug testing policy except for cause. [Doc. 193 Melcher 30(b)(6) Dep. at 98:6-100:5 (O.C.G.A. § 45-23-1 applies to BOR and Dr. Kavianpour)].

**Deprivation of Protected Property Interest**

410. On February 21, 2019, Dr. Kavianpour was deprived of her protected property interest in continued access to the hospital as a student and employee, and this deprivation was (falsely) asserted to be permanent or unreviewable as shown above in paragraph nos. 71-120.

**Denial of Adequate Process**

411. Dr. Kavianpour has never been provided any process or hearing for the suspension as Defendants eventually admitted when they claimed to reinstate her, [*see* above paragraph nos. 71-120] and after the alleged reinstatement Defendants affirmed her termination on the asserted basis that the denial of hospital access was still in place. [*See* above paragraph nos. 219, 246].

412. The sham process and hearings that Defendants did provide to Dr. Kavianpour to nominally address her termination were inadequate as shown in paragraphs 69-148 (March 2019 hearing), 177-258 (January 2020 hearing) and they were not a meaningful opportunity for Dr. Kavianpour to contest the suspension because Defendants believed or repeatedly asserted that they could not overturn the suspension. [See paragraphs above 47-53, 219-246]

413. The March hearing in 2019 was a sham and it was decided on the false premise that the drug testing was a term and condition of her employment. See paragraphs above 119-145.

414. The January 2020 hearing process was a sham with a predetermined outcome, and done without a contract or reinstatement. See paragraphs above 196-255.

415. Since December 2021 the ACGME citation provided Defendants notice that their contract and House Staff policies 13 and 18 require, before a non-renewal, at least three months of remediation for notice and opportunity to cure before a non-renewal, which has yet to be provided. [See paragraphs above 160, 174-5, 319 and below 486-516] .

416. In March 2022 Dr. Savage, the DIO admitted that she is taking the position that she does not have to correct past deviations that occurred under a prior DIO, that she has no authority to reinstate Dr. Kavianpour, that she cannot require a program director to reinstate a resident, and that otherwise Dr. Savage is refusing to enforce the contractually required process that would provide reinstatement and opportunity to cure. [See paragraphs 319, 323-24.]

417. Dr. Macomson has taken no action to reinstate Dr. Kavianpour.

418. Because Dr. Kavianpour is not reinstated and does not have a current contract, she cannot demand a CCC hearing to request her hospital access be restored even though there is no evidence of performance problems.

**Pre-deprivation Process Was Required**

419. Plaintiff had a procedural due process right to pre-deprivation process, adequate notice and a meaningful chance to respond, for her protected property interest in her continued employment and in her continued status as a student accused of non-academic misconduct.

420. There was no legitimate need for emergency action with respect to the suspension on February 21, 2019, because Dr. Coule did not act immediately to suspend upon being told during the planning of the process of the allegations that would be used about the purported violations of drug testing policy or "mandatory" testing, and instead waited several days or more and then suspended Dr. Kavianpour for the purpose of terminating her, where there is no evidence of any performance issue or impairment.

421. There was nothing impracticable or unforeseeable about needing to provide meaningful notice and a chance to respond prior to the February 21, 2019, suspension-termination because none of the people responsible for the failure to

provide process prior to the suspension-termination were subordinate rogue actors whose actions Defendants could not have reasonably foreseen.

422. Instead, as shown above in the *Monell* discussion, the denial of pre-deprivation due process was deliberately caused by official policymakers Dr. Coule, Clark Speese, Debra Arnold, Susan Norton, and Greg Bryan and by official policy or custom.

**The Allegations Against Dr. Kavianpour Were False And Unjustifiable**

423. The falsity and baselessness of the allegations against her show that Dr. Kavianpour (1) would have meaningfully contested the allegations against her if she had had adequate notice and opportunity to do so, (2) Defendants had to have a sham process to prevent Dr. Kavianpour from proving them wrong, (3) Defendants will not be able to prove the affirmative defense to a subset of damages that they would have imposed the challenged deprivations even if adequate process had been provided, and (4) the falsity of the allegations are relevant to Count V's stigma plus claim.

424. As shown in paragraphs 293-299 above, the allegations against her were false and baseless.

**This Claim Is Timely Brought With the Statute of Limitations**

425. Count II could not accrue until Dr. Kavianpour was deprived of her protected interest in continued education and employment, which did not happen until Dr. Kavianpour received the letter, dated August 18, 2020, and marked as sent on the 19th, from Edward Tate on behalf of BOR, notifying her that BOR had affirmed the institution's recommendation and that termination was the "final" decision.

426. Dr. Kavianpour received the letter from Edward Tate no sooner than August 23, 2020.

427. Because Count II relies (in the alternative or in part) on the inadequacy of post-deprivation process, the lack of such process was not complete and the claim could not have accrued until the state fails to provide process, which did not occur until March 2022, when DIO Savage determined that, despite the ACGME citation informing Defendants that adequate process had not been followed with respect to Dr. Kavianpour, Savage decided or asserted that it was not her responsibility to reinstate Dr. Kavianpour or otherwise provide adequate process to her, even though, as shown above in paragraph nos. 315-322**,** she has the duty and authority to enforce ACGME requirements for adequate process and to remedy the violations thereof noted in the ACGME citation.

428. Alternatively, Count II could not accrue until September 2, 2020, when Defendants informed her there was no further process available to her, or August 23, 2020, when she was notified of the final decision on her termination.

429. The continuing violation doctrine also applies because the denial of procedural due process was a policy or practice that was ongoing from February 2019 until August 23, 2020 or September 2, 2020 when Dr. Kavianpour received final notice of the termination and was notified that Defendants would provide no further process.

430. Alternatively, Counts II is timely because it relates back to the filing of the original complaint.

**Count III**
**Procedural Due Process for the Second Termination in 2020**

431. Plaintiff brings this count under section 1983, *Ex parte Young*, and the procedural component of the Fourteenth Amendment due process clause against the same Defendants in the same capacities and for the same type of relief as stated above in Count II, paragraph nos. 354-364.

432. These Defendants were acting under color of law or as state actors for the same reasons shown above in Count II, paragraph nos. 365-370.

433. These Defendants are liable for their personal participation or causal role in the violation and applicable *Monell* requirements are satisfied for the same reasons as shown above in Count II in paragraph nos. 371-399.

434. By December 16, 2019, Dr. Kavianpour had a protected property interest in her continued status as a resident, i.e. student and employee because BOR allegedly reinstated her and thereby provided that she could only be terminated for cause consistent with her prior employment contract in 2018-2019. [*See* above paragraph nos. 400-410 and below paragraph nos. 474-488 (showing she had a protected property interest from the 2018-2019 contract)].

435. As of the sham reinstatement, without contract and without access to clinical activity or opportunity to allegedly remediate if the reinstatement were real, about December 16, 2019, she had a protected property interest in continued status as a student and employee because Defendants are equitably estopped from denying benefits of the contract they claimed to be reinstating, or the prior understanding and terms of the contract and the ACGME required terms and conditions of a residency.

436. Through this sham process and a hearing on January 7 and 9, 2020, and decision dated on about January 11, Dr. Kavianpour was "terminated,' and her

(purported) contract was non-renewed, and she was deprived of salary, so she was deprived of a protected property interest.

437. As shown above in paragraph nos. 196-212, the January 2020 hearing failed to provide Dr. Kavianpour a meaningful opportunity to contest her termination.

438. The hearings and process for the second termination were a sham, futile, and not a meaningful opportunity for Dr. Kavianpour to contest the termination.

439. Two of the relevant decision makers, Dr. Macomosn and Dr. Vale, did not believe they were able to retain Dr. Kavianpour nor reverse the termination by the plan using Dr. Coule in 2019, because Defendants took the position that the suspension of hospital access could not be overturned and that the suspension necessitated termination.

440. In other words, the decision makers for the hearings and process were inescapably biased towards termination and had pre-determined and pre-ordained that termination was required because of the suspension they believed or asserted they could not overturn.

441. The process was a sham because Defendants had already effectively decided it would not result in retaining Dr. Kavianpour as a resident, and deliberately refused to allow her to contest the suspension, and their asserted basis for the termination.

442. Prior to the January 2020 hearing Dr. Kavianpour was never provided adequate notice of the allegations against her nor a description of the alleged evidence against her, and therefore Dr. Kavianpour unable to meaningfully respond to the unknown allegations against her. [*See* above paragraph nos. 196-212.]

443. The decision makers for the process in 2020 including Susan Norton were biased against Dr. Kavianpour because she had previously accused them of violating laws and policies.

444. Defendants "reinstated" Dr. Kavianpour but failed to actually provide a new written contract, hospital access, or an opportunity to cure any alleged performance issues, and therefore she was unable to demand the contractual right to a CCC hearing where she would have been able to set the topics for the hearing, and had a right to informal mediation and negotiation with the department.

445. Dr. Kavianpour would have been able to grieve and address the retaliation for having engaged in protecting patients relative to February 13, 2019 the violation of the requirement that the Department provide a safe pager policy, and that Dr. Vale would have taken the pager, but HR and Dr. Coule rejected that straightforward solution.

**Count IV**
**Procedural Due Process The Initial Termination**

446. Plaintiff brings this count under section 1983, *Ex parte Young*, and the procedural component of the Fourteenth Amendment due process clause against the same Defendants in the same capacities and for the same type of relief as identified above in Count II, paragraph nos. 354-364.

447. These Defendants were acting under color of law or as state actors for the same reasons as shown above in Count II, paragraph nos. 365-369.

448. These Defendants satisfy applicable *Monell* requirements and individual liability requirement of personal participation or a casual role in the violation, for the same reasons as shown above in Count II, paragraph nos. 371-399**.**

449. Dr. Kavianpour had a protected property interest in continued status as a student and employer that could only be extinguished for cause because she had a contractual right to that effect as well as a mutual understanding of that right rooted in Defendant's policies and assurances. [*See* above paragraph nos. 25-40, 400-410].

450. Dr. Kavianpour was deprived of her protected property interest, in her continued status as a student accused of misconduct and in her continued status as an employee, when she was terminated on February 21, 2019.

451. Before February 21, 2019, Dr. Kavianpour received no notice, process, or hearing to contest her termination.

452. After the termination, Dr. Kavianpour was never provided a meaningful opportunity to contest the termination because Defendants had already pre-ordained and pre-determined that the termination would be upheld because of the suspension and because of their assertions or belief that they did not have the authority to overturn the suspension.

453. Prior to March 2019 hearing and January 2020 hearing, Defendants did not provide Dr. Kavianpour adequate notice of charges against nor a description of the alleged evidence upon which they would rely, as shown above in paragraphs 207-209, 260-264, and therefore she did not have a meaningful opportunity to respond to allegations of which she was unaware

454. And Dr. Kavianpour was never provided any process or hearing to contest the suspension, i.e. the asserted basis for the termination.

455. The decisionmakers for the post-termination process were biased and had pre-judged the decisions, because it had already been determined that the suspension would not be overturned and that the suspension required termination.

456. The post-termination process, including the March 2019 grievance hearing, January 2020 CCC meeting, February 2019 Ad Hoc Committee, and final was a

sham because it was designed to prevent Dr. Kavianpour from meaningfully contesting the termination by not allowing her to contest the asserted basis of the termination, the suspension. [*See* paragraph nos. 88-96, 177-195]. By early March 2019, BOR's agents had already decided Dr. Kavianpour was "ineligible for rehire" and the decisionmakers for the subsequent appeal, including the March 2019

457. The actual decisionmakers for the March 2019 hearing included Dr. Coule, Susan Norton, and Debra Arnold who were biased against Dr. Kavianpour because she had previously accused them of wrongdoing and violations of law and policy.

**Count V**
**Procedural Due Process Stigma-Plus Claim**

458. Defendants are liable for a deprivation of Dr. Kavianpour's liberty interest in her good name and reputation without providing due process, namely a meaningful name-clearing hearing.

459. In connection with Defendants' suspension–termination of Dr. Kavianpour in 2019 and 2020 they made public, false, and stigmatizing statements about her including that she was a substance abuser, violated the drug testing policy, was a chronic marijuana user who could not function with it, erroneously referred to

her initial canceled pre-employment drug test as positive, [*see* paragraphs above nos. 78, 125, 265-266, 288-292.**]**, and Dr. Coule claimed at the March 2019 hearing that she engaged in subversive behavior by over-hydrating to prevent her (urine) drug tests from being positive.

460. Plaintiff brings this claim against the following Defendants whose personal involvement liability specified in the following paragraphs: Defendant AUMC for monetary damages and injunctive relief, Defendant Dr. Coule in his individual capacity and his official capacity as an official policymaker for AUMC for monetary damages and injunctive relief, Defendant Clark Speese in his individual capacity, Defendant Debra Arnold in her individual capacity, Defendant Susan Norton in her individual capacity, Defendant Greg Bryan in his individual capacity, and the following Defendants in their official capacity and as official policymakers for BOR for injunctive relief only: Dr. Samuel Macomson, Dr. Natasha Savage, Dr. David Hess, and Brooks Keel.

461. Defendants Dr. Coule and AUMC's actions and refusal to act were under color of law and constituted state action as shown above in Count II, paragraphs 365-367, 369.

462. As a result of these stigmatizing statements Dr. Kavianpour has been prevented from continuing her medical education and from gaining employment

as a doctor, because Dr. Kavianpour applied to almost every other neurosurgery department to match in the 2021 and 2022 cycle, because these Neurosurgery departments brought up the stigmatizing allegations against Dr. Kavianpour during the application and interview process and refused to hire Dr. Kavianpour because they knew she had been accused of being a substance abuser and having professional issues.

463. Defendants did not provide Dr. Kavianpour a meaningful opportunity for a name-clearing hearing, because (1) Defendants did not inform her of her right to a name clearing hearing, as is required, (2) she did not receive timely or adequate notice of the stigmatizing statements prior to and necessary for having a meaningful chance to respond at a hearing, and (3) she did not have a chance to respond that was public and thereby could not clear the tarnish inflicted by Defendants' stigmatizing statements.

464. Plaintiff's Count V stigma-plus claim could not accrue or the statute of limitations was tolled until she finally learned, despite her due diligence, of the stigmatizing publications, which (1) as to the statements sent to the Licensure Department of the Georgia Composite Medical Board and to the American Board of Neurological Surgery, was at the earliest January 2020 pursuant to an Open Records Act request, (2) as to the statements sent to the ACGME, was March

2022 through discovery, and (3) as to the statements from the August 2018 meeting, was also March 2022 in discovery.

465. Defendant Dr. Coule made stigmatizing and false statements at the March 2019 hearing about Dr. Kavianpour being a substance abuser and those statements were publicized. [*See* above paragraph nos. 265-266.]

466. Defendants Susan Norton and Debra Arnold were responsible for making the false and stigmatizing statements that Dr. Kavianpour violated the drug testing policy, that her initial, canceled, drug test result was positive, and that she was a substance abuser, and Defendants Susan Norton and Debra Arnold knowing caused these statement to made public at the March 2019 hearing [*see* above paragraph nos. 67-68 & 306] and when Defendants Susan Norton and Debra Arnold included the statements in emails, which are accessible to the public via an open records act request.

467. Defendants Debra Arnold, Clark Speese, Greg Bryan, and upon information and belief Susan Norton, made and allowed the stigmatizing and false statement publicized at the August 2018 meeting that Dr. Kavianpour was a chronic marijuana user and could not function without, [*see* above paragraph no. 292], and these Defendants further caused the statement to be made public.

468. Defendant Debra Arnold at the publicized March 2019 hearing made the false and stigmatizing statement that Dr. Kavianpour violated the drug testing policy and was missing drug tests when Arnold was making off-duty drug tests requests that were impermissible.

469. Defendant Debra Arnold provided the stigmatizing and false information to Dr. Savage that resulted in Dr. Savages' false report to the ACGME that Dr. Kavianpour used amphetamines.

470. The Defendants sued in this Count V had personal involvement or a causal connection, satisfying *Monell* requirements, to the challenged failure to provide meaningful process to Dr. Kavianpour, including a name-clearing hearing, as shown above in paragraphs 371-399.

**Count VI- Breach of Contract**
**Breach of Contract Failing to Implement H.S. 13.0 and 18.0**
**Against Defendants AUMC and BOR**

471. Dr. Kavianpour asserts breach of contract claims against BOR and AUMC because her employment contract subjected her to AU's House Staff Policies.

472. Defendants breached the terms of her contract by violating House Staff Policies 13.0 and 18.0.

473. Dr. Kavianpour's employment contract incorporated by reference House Staff Policies 13.0 and 18.0.

474. Dr. Kavianpour's employment contract [Doc. 3-2] states that "Augusta University Policies and procedures for House Officers govern the following conditions of [Dr. Kavianpour's] employment," including "procedures for discipline and redress of grievances," and "[t]hese policies can be accessed at https://www.augusta.edu/mcg/residents/hspolicies/index.php"; Defendants regularly edit their policies and add to the policies posted online, so the versions of the policies in place when Dr. Kavianpour was employed were entered into the record at [Doc. 228-24.].

475. Both BOR and AUMC are parties to the contract.

476. AUMC is a party to Dr. Kavianpour's employment contract [Doc. 208-6 ECF p. 2-3] because the contract and House Staff policies were signed by Walter Moore as Dean for Graduate Medical Education (GME), which is a composite department consisting of the Medical College of Georgia and AUMC.

477. "AUMC is part of or is under the umbrella of the Medical College of Georgia" and "if the [ACGME] sponsoring institution [MCG] is also a participating site [AUMC], then they're the same" for the administration and operation of the neurosurgery residency program. [Doc. 178-1 Macomson 30(b)(6) Dep. 98:16–100:21; Doc. 178- 19 Pl. Ex. 191.]

478. AUMC is further established as a party to Dr. Kavianpour's employment contract because the intent of the signatory parties in the House Officer Notice of Appointment, i.e. the employment contract, was to provide Plaintiff with neurosurgical training that occurs at AUMC, i.e. the "House" of which residents are officers, and to provide that training consistent with ACGME requirements in order to maintain accreditation and funding.

479. AU Medical Center is the primary "clinical site where the residents practice medicine" in the Neurosurgery residency training program. [Macomson 30(b)(6) Dep. 27:22-24; Doc. 177-2 Coule Dep. 127:9-18.]

480. The House Officer Notice of Appointment, i.e. the employment contract, is designed to fulfill the ACGME requirement that all residents be given a written contract with the terms and conditions of their residency employment. [Doc. 178-1 Macomson 30(b)(6) Dep. at 33:12-18, 37:15-18.]

481. Defendants BOR and AUMC must follow ACGME requirements, including the requirements for resident training employment and due process, as Defendants admitted. [Doc 177-2 Coule Dep. 143:10-16, 144:24–145:1; Doc. 190- 13 Medical Staff Bylaws ECF p. 5-6 ¶7; Doc. 190 Kavianpour Vol II Dep at 153:2- 156:21; Doc. 178-1 Macomson 30(b)(6) Dep. 126:1–127:9, 128:3–

129:2, 132:20-24; Doc. 177-1 Seehusen 30(b)(6) Dep. 39:23–40:3, 40:17-20, 41:20–42:11, 44:22–45:3]

482. The employment contract specifically provides that "House Officers [i.e. residents] also agree to abide by the policies at any institution where they may perform services, including AU Health System, … and others, as applicable," which includes AUMC because AU Health System includes and is the parent institution of AUMC (and of course AUMC an "applicable" institution).

483. The employment contract stated that "AU Medical Center" will provide "[c]all rooms" and "a meal or a meal allowance" for residents, showing residents are House Officers for AUMC.

484. The purpose of the employment contract includes providing that House Officers are subject to requirements of "Augusta Health Medical Center (AUMC) at Augusta University," and to fulfill this purpose the employment contract provides that "A signed contract is obtained from each member of the Augusta University Housestaff."

485. Alternatively, AUMC is a party to the contract because it is a component or subdivision of BOR doing business as AU as shown in paragraphs 6, 26, 477.

486. Augusta University HS Policy 18.0 § 2.1 "House Officer Performance" requires documented counseling sessions for any performance problems;

according to § 2.2, "[i]f, after documented counseling …"performance does not improve then formal remediation must occur as stated and outlined in § 2.3, which requires remediation last for at least "three months," before a decision for nonrenewal could be made per § 2.5. [Doc. 178-10 (HS Policy 18.0).]

487. H.S. 13.0 § 2.1 requires that the residency program have a Clinical Competency Committee (CCC) tasked with, among other matters, to recommend feedback and counseling as needed to correct deficiencies; to recommend non-renewal or remedial action for House Officers who have failed to make adequate academic progress; and to recommend disciplinary action, including dismissal, of a House Officer who has violated any applicable law or policy. [Doc. 178-6 ECF p. 1.] In addition, H.S. 13.0 § 2.2.1 requires "[r]ecommendations of nonrenewal must be made at least four months before the end of the current contract period." [*Id*.]

488. *Violation of H.S. 18.0 and H.S. 13.0*: Dr. Kavianpour was given a purported remediation plan on February 11, 2019 [Doc. 192-17 Pl. Ex. 99] but terminated ten days later. Defendants cut short the three-month remediation plan required under HS Policy 18.0 § 2.1 and failed to provide, per 13.0 § 2.1, a CCC meeting's recommendation of feedback or counseling to correct any purported deficiencies in Dr. Kavianpour's performance.

489. *Violation of H.S. 13.0*: Defendants violated H.S. 13.0 § 2.2.1 because Defendants (1) failed to have a CCC meeting recommend disciplinary action, non-renewal, or dismissal, before they terminated Dr. Kavianpour in February 21, 2019 and (2), when non-renewing Dr. Kavianpour in January 2020, Defendants failed to recommend the nonrenewal of the contract at least four months before the end of the contract period, because they decided to non-renew just several days after the CCC meeting.

490. *Violation of H.S. 13.0*: Defendants violated H.S. 13.0 § 2.0 because Defendants did not provide a CCC for the following functions (1) periodically review the performance and academic progress; (2) recommend feedback and counseling for any alleged deficiencies; and (3) recommend remedial action if there was a failure to make adequate academic progress.

491. On February 11, 2019, the purported counseling and remediation plan provided to Dr. Kavianpour was not an "evaluation" process determined by a Clinical Competency Committee (CCC) as required under HS 13.0 because a CCC had not "review[ed] the performance" of Dr. Kavianpour to "recommend feedback and counseling" or recommend "remedial action." [Doc. 178-6 (HS 13.0)]

492. Dr. Kavianpour was never given notice of the non-renewal of her contract before she was terminated on February 21, 2019, so there was an expectation of a second-year contract.

493. Dr. Kavianpour was never provided a CCC hearing before she was terminated.

494. Defendants' purported January 2020 CCC meeting did not cure their failure to provide a CCC hearing in February 2019. Realizing they failed to provide Dr. Kavianpour a CCC hearing or her full appeal rights before terminating her, BOR made a unilateral determination to retroactively "reinstate" Dr. Kavianpour as an employee of AU on or around December 16, 2019. [Doc. 193 Melcher 30(b)(6) at 80:11-81:12].

495. By December 2019, Dr. Kavianpour was no longer under contract with Defendants because she had been terminated and had not been given another written contract. [Doc. 178-1 Macomson 30(b)(6) Dep. at 37:10-22].

496. Defendants convened a CCC meeting on January 7, 2020 and again on January 9, 2020 and then on January 11, 2020, Dr. Rahimi signed the CCC's recommendation that Dr. Kavianpour's contract be non-renewed. [Doc. 192-25 Pl. Ex. 177 ECF p. 1.]

497. On January 16, 2020, Dr. Macomson sent Dr. Kavianpour a letter accepting the CCC's decision for nonrenewal of an expired contract or a "contract, which expires 6/30/2020," [Doc. 201-43 ECF p. 3.].

498. This failed to remedy the breach of H.S. 13.0 § 2.2.1, which requires "[r]ecommendations of nonrenewal must be made at least four months before the end of the current contract period." [Doc. 178-6 ECF p. 1 (HS 13.0).

499. Defendants formed an Ad Hoc Committee to review the CCC's recommendation of non-renewal; the Ad Hoc Committee held a meeting on April 28, 2020.

500. On May 1, 2020, the Ad Hoc Committee's Chair Dr. Hocker signed a report and recommendation that adopted the CCC recommendation to Dean Hess to uphold the Program Director's decision. [BOR0042732-4.]

501. The Ad Hoc recommendation used the suspension by Dr. Coule on February 21, 2019 as a basis to uphold the non-renewal. [BOR0042732-4].

502. On May 22, 2020, President Keel upheld the decision for non-renewal. [BOR0042738.]

503. On August 2, 2020, Dr. Kavianpour appealed to President Keel (again pursuant to USG policy) and the University System of Georgia BOR in her

Application for Discretionary Review pursuant to 6.26. [Doc. 204-27 Pl. Ex. 226].

504. On August 18, 2020, Edward Tate signed a letter on the BOR's behalf, advising that the BOR Discretionary Review Committee had affirmed the institution's decision. [BOR0042743]

505. Dr. Kavianpour received the letter from Edward Tate no sooner than August 23, 2020.

506. Neither the Ad Hoc hearing nor the January 2020 CCC meeting provided an adequate appeal or review of Dr. Coule's suspension, non-renewal, and termination. Neither the Ad Hoc hearing nor the CCC meeting's review of Dr. Coule's February 2019 decision to suspend Dr. Kavianpour's clinical privileges can be considered an independent review because neither meeting group knew that they, and BOR, had the authority to overturn Dr. Coule's suspension of Dr. Kavianpour's clinical privileges.

507. At all relevant times, Dr. Macomson admitted that he was unaware that BOR had the authority to overturn Dr. Coule's suspension of clinical activities as Program Director. [Doc 178-1 Macomson 30(b)(6) 30:2-31:10.]

508. Defendants' failure to provide an appeal process or CCC meeting with authority to reinstate to recommend disciplinary or termination demonstrates

Defendants never intended to perform their contractual promises made to Dr. Kavianpour to follow H.S. 13.0's provisions governing staff evaluation and discipline.

509. At all relevant times, Dr. Macomson admitted that he was unaware that BOR had the authority to overturn Dr. Coule's suspension of clinical activities as Program Director. [Doc 178-1 Macomson 30(b)(6) 30:2-31:10.]

510. It was not until Dr. Macomson's 30(b)(6) deposition in March 2022 that he was made aware that he had the authority to overturn Dr. Coule's suspension.

511. Dr. Macomson admitted that he knew that Dr. Kavianpour had no performance problems.

512. Dr. Macomson learned and admitted that monthly testing was not a condition of Dr. Kavinapur's contract.

513. Dr. Macomson and Dr. Savage are aware of the ACGME citation indicating substantial non-compliance because they have not reinstated Dr. Kavianpour and given her notice and opportunity to cure through remediation.

514. Dr. Macamson, the ACGME Program Director of the Neurosurgery Program, has not taken action to reinstate Dr. Kavianpour, forcing Dr. Kavianpour to resort to litigation to be reinstated.

515. Dr. Savage, the ACGME Designated Institutional Official, for Defendants AU and AUMC, as the Sponsoring Institution, has not taken action to reinstate Dr. Kavianpour, causing Plaintiff to have to litigate to get reinstated.

**New Or Continued Breach Through August 23, 2020**

516. As of the alleged reinstatement on December 16, 2019, which was without a new written contract and without access to the hospital or clinical activity and therefore without the required opportunity to remediate, i.e. improve her performance at clinical activities to satisfy any concerns about her performance; her prior employment contract from 2018-2019 was renewed or Defendants are equitably estopped from denying benefits of the contract according to the prior understanding and terms of the contract including HS 13 and 18 as shown above.

517. When Defendants terminated or non-renewed Dr. Kavianpour as of August 23, 2020, without the contractually required process, this was either a new breach of her employment contract or a continued breach that did not accrue until August 23, 2020.

518. Defendants' admitted that they never intended to reinstate Dr. Kavianpour, thus, Defendants also violated their obligation to engage in this litigation in good faith. *See* § 13-6-11.

519. Defendants have acted in bad faith, have been stubbornly litigious, or have caused Dr. Kavianpour unnecessary trouble and expense, justifying litigation expenses under O.C.G.A. § 13-6-11.

520. Defendants' admission that they never intended to reinstate Dr. Kavianpour violated the implied contractual duty of good faith and fair dealing because they failed to perform their own promises and implement H.S. 13.0's provisions for remedial training, a four-month notice before a non-renewal of a contract.

521. Dr. Kavianpour respectfully seeks a remedy of specific performance ordering Defendants to reinstate her.

**Count VII**
**Mandamus**

522. Pursuant to O.C.G.A. § 9-6-20, Dr. Kavianpour has a right to a mandamus against Defendants AUMC, Dr. Coule, Clark Speese, Susan Norton, Dr. Macomson, Dr. Keel, Dr. Hess, and Dr. Savage in their role as officials for BOR and AUMC.

523. Dr. Kavianpour has a legal right to and Defendants have a public or legal duty to provide her reinstatement including hospital access, a declaration that the alleged basis for her suspension and termination(s) is false, i.e. that she did not violate any drug testing policy, is not a substance abuser, did not pose a

threat to patient safety, and had no performance or other issue warranting suspension or termination; and, alternatively to the declaration, a meaningful name-clearing hearing.

524. Defendants' inaction towards or improper performance of their duty to reinstate Dr. Kavianpour and her hospital access and provide her with a name-clearing declaration or hearing, is a gross abuse of their discretion and violates a ministerial duty to provide this relief.

525. Dr. Kavianpour suffered the pecuniary loss for which she cannot be adequately compensated in damages including the damage to her reputation and educational progress, so she may seek a mandamus to enforce a private right.

526. In the alternative that the above Counts I-VI do not provide Dr. Kavianpour with reinstatement as a resident with hospital access, and a name-clearing declaration or hearing, Dr. Kavianpour has no other specific legal remedy than mandamus.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff respectfully prays for relief as follows:

For a trial by jury;

For a finding or declaration that Defendants violated Plaintiff's rights as set forth herein;

Directing Defendants to remove from Plaintiff's record any findings or conclusions produced in connection with their sham processes;

For a judgment in Plaintiff's favor for reinstatement in the Neurosurgery Residency Program; with full back pay plus interest, full fringe benefits, and seniority rights; reinstatement of hospital access, a name-clearing statement or declaration and alternatively a meaningful name-clearing hearing; compensatory damages for emotional distress; loss of reputation, wages, and benefits; punitive damages against all Defendants except for the defendants sued solely in their official capacity for BOR; attorney fees and litigation costs including for Defendants' bad faith conduct that caused the plaintiff unnecessary trouble and expense during the litigation, as provided by federal law and O.C.G.A. § 13-6-11; and

For any such other and further relief that is proper and just.

**JURY DEMAND**

Plaintiff requests a jury trial on all questions of fact raised by this Complaint.

Respectfully submitted this 22nd day of August, 2022.

LAW OFFICE OF JOHN P. BATSON

/s/ John P. Batson
Georgia Bar No. 042150
jpbatson@aol.com

Post Office Box 3248
Augusta, GA 30914-3248
Telephone: (706) 737-4040
Attorney for Plaintiff

LR 5.1(C) FONT COMPLIANCE CERTIFICATION

The undersigned counsel certifies that the within and foregoing was prepared using Times New Roman 14 point font in accordance with Local Rule 5.1 of the United States District Court for the Northern District of Georgia.

This 22nd day of August, 2022.

LAW OFFICE OF JOHN P. BATSON

/s/ John P. Batson
Georgia Bar No. 042150
jpbatson@aol.com

Post Office Box 3248
Augusta, GA 30914-3248
Telephone: (706) 737-4040
Attorney for Plaintiff